Estate of Harriet Old, deceased. Appeal of the Lancaster Trust Company, Trustee of the Wife and Children of James M. Hopkins, under the Will of Harriet Old, deceased, from the Decree of said Court confirming absolutely the Auditor's Report.

*Trust and trustees—Negligence of trustee—Investment in junior securities on land.*

A trustee by leave of court invested funds which were held in trust for H. during his life with remainder to his wife and children, in a judgment which was a fourth lien on land. The loan was permitted to remain uncollected for nineteen years, during which time the interest on the trust loan and the prior liens was permitted to accumulate. The land was finally sold and bought in by the first judgment creditor. Most of the remainder-men had consented to the loan and the others on arriving of age had not dissented, though presumably acquainted with all the circum-

stances. The conditions disclosed a family arrangement. *Held*, under all the circumstances, that the court below committed no error in declining to surcharge the trustee for negligence.

Argued May 19, 1896. Appeal, No. 134, Jan. T., 1896, by Lancaster Trust Co., trustee, from decree of O. C., Lancaster County, June T., 1890, confirming absolutely the auditor's report. Before GREEN, WILLIAMS, McCOLLUM, MITCHELL and FELL, JJ., WILLIAMS, J., presiding. Affirmed.

Exceptions to auditor's account.

The auditor, A. F. Hostetter, found the facts substantially as follows: Harriet Old, testatrix, by will proved March 12, 1870, bequeathed one half of the residue of her estate to Newton Lightner in trust for the benefit of James M. Hopkins " during his life, and at his death to be equally divided among the widow and children or their heirs."

Before this residuary bequest she had given and bequeathed $3,000 in trust for the benefit of William Hopkins during his lifetime; at his death, one half of said amount, $1,500, also, " to be continued in trust for the benefit of James M. Hopkins during his life, and at his death to be equally divided among his widow and children surviving him or their heirs; " $3,000, in trust, in like manner for Elizabeth O. Alexander " during her life, and at her death the principal to be divided equally among the children of herself and her husband, or their heirs; " and $1,000 in like trust " for the benefit of James M. Hopkins during his life, and at his death to be paid to his daughter, Harriet Old Hopkins."

Subsequent to the death of William Hopkins, Lightner, the trustee, by leave of the orphans' court of Lancaster county, invested all these funds, amounting to nearly $10,000 in a judgment loan to James M. Hopkins (the life tenant), which was entered in the common pleas of Lancaster county. The judgment became a lien on about 1000 acres of land on which there were already three judgments, one to Lightner, himself, as guardian, and aggregating $9,400. The first and third judgments were held by Jacob Thome, a brother-in-law of Hopkins, said Hopkins being also a brother-in-law of Lightner, the trustee. The widow, the adult children and two minor children joined in the petition to the orphans' court, asking permission

to make the investment. The third minor, the youngest of all, did not join. There was no evidence that the minors after arriving at age ever assented to or dissented from the loan, although they lived with their father on the premises and were conversant with the facts of the case. The trustee held this trust for nineteen years, during which time the judgments ahead of the trust judgment were regularly revived, and greatly increased in amount by accumulations of interest. The lands, which had been chiefly valuable because of furnace property, subsequently depreciated in value until after the death of the trustee, when his administrator issued execution upon the judgment; the liens ahead of it at that time aggregating about $35,000. The property was not worth more than $25,000 and the land was bought in by the holder of the first judgment for $8,000. The whole of the trust fund was, therefore, lost for the wife and children of Mr. Hopkins. The successor of Newton Lightner, the trustee, sought to charge his estate with the loss by reason of negligence and lack of authority to make the investment; on the grounds, first, they were not invested by order of the orphans' court; second, if so invested the order was improvidently made; third, that if invested by order of the orphans' court it was at a time when property was of much greater value and the prior liens much less, and that the trustee was guilty of negligence in not collecting the judgment, through which neglect the trust estate has been put to a loss for which the individual estate of the deceased trustee is liable. As to the first point, the auditor found that the moneys were invested under the order of the orphans' court. As to the second point he found specifically as follows:

" The auditor is of the opinion that the order of court was not improvidently made; that it was made upon a full and fair disclosure of all the material facts in the case to the court, and not only with the knowledge, but also at the request, of all the persons interested in the estate who were of lawful age.

" The court having had jurisdiction to make the order, and having, upon a full view and consideration of the facts, directed the investment, the trustee is fully protected against all the natural consequences of the original investment, both as to those who were and as to those who were not at the time of proper age to consent: Act of March 29, 1832, sec. 14, P. L. 193; Twadell's App., 5 Pa. 15; Ihmsen's App., 43 Pa. 431.

" We are not, therefore, called upon to pass on the propriety of the original investment. Had Mr. Lightner invested this trust fund upon his own responsibility, and without an order of court, in a judgment subsequent to other liens, and it had then been lost, as it has in this case, this question would be before us, and the burden of showing the propriety of the investment would then be upon the accountant."

As to the third point the auditor ruled as follows :

But having been made under the direction of the orphans' court we must start in the present inquiry by asssuming it to have been a proper one. And we must further assume that in the absence of subsequent negligence on his part, the protection of the order of court extends to the trustee against liability for all such dangers and contingencies as might reasonably be involved in a loan of this character made on a fourth judgment.

The danger that Mr. Hopkins might not keep down the interest on prior liens, and the contingency of a depreciation in the value of the lands, were both possibilities of this kind. And it must be presumed for the purposes of this investigation that they were fully considered both by those of Mr. Hopkins' children who joined in the petition, and by the court when the investment was ordered to be made. No negligence can hence be inferred against the trustee simply from the fact that both of these conditions actually did arise to confront him during his trusteeship.

The real question to be passed upon in this contention is, how did Mr. Lightner act with reference to the trust estate in his hands, subsequent to the original investment, in view of the conditions as they really came to exist? This is the vital issue raised by the exceptions.

The entire trust fund of $10,000, in which the moneys involved in the present controversy are included, has been swept away by the sheriff's sale of the real estate to Mr. Thorne, and the loss must fall either upon Mr. Hopkins and his children, the beneficiaries of this fund under the will, or be made up to the new trustee for their benefit out of the individual estate of the deceased trustee.

Upon which of them it is to fall depends upon the answer given to the mixed question of law and fact raised by the alle-

gation of the exceptions, that Mr. Lightner failed in his conduct to come up to the measure of duty required of him by the law as trustee, and that the loss is owing to his negligence. If this claim be sustained, the loss must be made up by his estate: Lechler's App., 21 W. N. C. 505. If not, it must be borne by Mr. Hopkins and his children.

It is claimed on behalf of the exceptant that the present contention is ruled in its favor by the decision in Lightner's Appeal, 156 Pa. 368, and 150 Pa. 529, which grew out of this same trust in Mr. Lightner's hands. As to $3,000 of the trust fund (being the portion which is not included in the account now under review), Mrs. E. O. Alexander, and not Mr. Hopkins, was by the will given the annual interest.

The whole controversy in Lightner's Appeal was over the liability of Mr. Lightner's estate for that portion of this interest which Mrs. Alexander had not received. The auditor surcharged Mr. Lightner's estate, and the Supreme Court affirmed him. This was on the ground that Mr. Lightner had practically abandoned his trust as to this interest, making no effort whatever to collect it, and so was grossly negligent.

This had reference, however, only to the interest. And it will be observed that the auditor distinctly declines to pass on the question of Mr. Lightner's liability for the corpus of the fund, as not being before him.

The question in the present proceeding is entirely different from that in Mr. Lightner's appeal. There the duty of the trustee was the collection year by year of interest, and payment to the beneficiary. Here he had no duty of collection as to the yearly interest, the fund being invested by order of court in the hands of the person entitled to the interest. His duty here was to preserve and protect the corpus of the fund. This decision in Lightner's Appeal, therefore, does not rule this case.

The principles of law relating to the duties and liabilities of trustees are well settled in Pennsylvania: Calhoun's Estate, 6 Watts, 188; Chambersburg Assn. Appeal, 76 Pa. 203; Cridland's Estate, 132 Pa. 479.

* * * * * * * * *

The chief difficulty in passing on questions of negligence is not, however, in ascertaining the principles of law governing

them, but in the application of these to the particular facts of each case.  This is especially true in a case like the present, where the evidence as to the material points is very meager and leaves so much to be desired in enabling one to form a fair judgment.  The peril into which this trust fund fell grew out of two facts, viz: The failure of Mr. Hopkins to keep down interest on the prior liens, and the depreciation of the lands.

As to the interest there is no competent evidence before the auditor that Mr. Lightner had any information on this subject other than what he must be presumed to have gained from observing the accumulation of these liens at their successive revivals.  So far as this record shows, Hopkins paid him the interest promptly on the prior lien which he himself held up to 1885, four years before his death.  On Mr. Thome's judgment for $5,200, the first revival in 1874 includes no interest.  The revival in 1879 does include interest; so this would seem to be the first notice to Mr. Lightner on that judgment.  On Mr. Thome's judgment for $10,000, the first revival in 1874 contained notice that the interest was not being paid, and that in 1879 includes interest from 1871.  In 1879, therefore, Mr. Lightner must have known that Mr. Hopkins was not keeping up the interest on these liens, and that they had increased by from $6,000 to $8,000.  What special duty, if any, this knowledge laid upon Mr. Lightner depends largely upon the then value of the lands, and upon what Lightner knew, or was bound to know, of their depreciation if there had at that time been any.  This is true, not only at that particular time, but as to knowledge of this character which he obtained at any time.

On the whole subject of the value from time to time, during the continuance of the trust, of these lands, and of the time and ratio of depreciation, the evidence is meager and unsatisfactory.  There is no direct proof of their actual value at the time the original investment was made, nor at any other time except since the death of the trustee.  We are practically left only with the assessment books as our guide.

In Lightner's Appeal, 156 Pa. 368, the auditor found as a fact that they were worth when the money was invested about $70,000, but there is no such evidence before us.  Hopkins himself, in his letter asking for the loan, seems to value them at no less than $50.00 per acre, which would be a minimum of

about $50,000.  Whatever they were worth, it seems to be conceded that their value was considerably more at that time than the whole debt, which, including the trust judgment, was about $30,000.

The only other direct evidence as to value relates to the period since the death of Mr. Lightner—to about the time when the lands were sold by the sheriff.  They were sold for $8,000, but owing to the peculiar circumstances of the situation, this can manifestly not be regarded as their actual value.  But the testimony of the witnesses produced by the exceptant, ranging in estimates from $22,000 to $32,000, shows that in 1893, four years after the death of Mr. Lightner, the lands had much depreciated from their value in 1870, and that the margin of security for the trust judgment had then been wiped out.  This testimony, however, gives us little or no aid in fixing their value at the time of Mr. Lightner's death nor at any period during the trust; the witnesses testify in a general way that there was a gradual depreciation in farm lands in Mr. Hopkins' neighborhood for about ten years prior to 1893, or about five years prior to Mr. Lightner's death, and that these lands had thus depreciated; but there is no evidence showing the extent to which this depreciation had gone at any particular period or at the trustee's death.

As to values between 1870 and 1893, and as to the rate of depreciation from the time it began, there is no evidence before us except the record of the yearly assessments of the lands for taxes.

At the time the investment was made they were assessed at $18,307.  In 1879, when the revival of Mr. Thome's $10,000 judgment disclosed interest on it from 1871, the assessment stood at $27,665.  This was an increase in the valuation of the lands of more than the growth of the prior liens, and would have indicated that notwithstanding the accumulation of interest on these, the trust judgment had still as large a margin of security as when entered.

When the two Thome judgments came to be revived again in 1883, the $5,200 judgment was revived without interest and the other at $15,000, thus showing that all the overdue interest on first and part of the latter had been paid off.  This had been done by applying the proceeds of a sale by Mr. Hopkins of one hundred and thirty-five acres, in the year 1883, at $50.00 per

acre. The Thome judgments had thus been brought down several thousand dollars lower than they stood at the former revival in 1879, while the assessment of the lands, even after the sale, continued at $27,665 until 1885, when it was reduced to $25,065. And while it is true that these reductions were made entirely by proceeds of land sold, the fact of a sale of such a tract of land without buildings at $50.00 per acre, and another smaller sale at the same price in 1885, would naturally be calculated to establish Mr. Lightner's confidence, by seemingly fixing such a value for what remained as would still leave a margin for the trust moneys.

When we come to the Thome revivals of 1888, his judgment had increased to such an extent as to add $10,000 to the principal of the prior liens, thus making them about $30,000, instead of $20,000 when the trust moneys were invested. The assessment at this time was $24,865, or about $15,000 less than the total debt, including the trust moneys. But in 1870, when the order of court was made, the assessment had been $12,000 less than the lien debts. And, therefore, judging alone from the valuations of the assessors, the depreciation in the margin of the security of the trust judgment would have seemed only about $3,000, notwithstanding the great increase in the prior liens. Substantially the same condition existed at Mr. Lightner's death a year later.

It is indeed altogether probable, in the light of the evidence of a gradual depreciation in farm lands in that section for about ten years prior to 1893, that these lands had depreciated more at Mr. Lightner's death than the assessments would indicate. But there is no actual proof of this, nor of the extent to which the depreciation had gone.

We may even think that Mr. Lightner, as a man of affairs, and as a careful trustee, must have known that they had thus depreciated, but we could not safely find such as the fact in the absence of evidence. It is to be remembered that we are looking back in this investigation from a standpoint at which we know that these lands had finally depreciated to such an extent that the whole trust fund is lost. But we cannot fairly infer negligence from the simple fact of the loss: Jack's Estate, 94 Pa. 371.

Unfortunately Mr. Lightner is dead, and, therefore, not in

position to show what his judgment was as to the value of these lands from time to time after the depreciation set in, or of the relative security of his investment; nor, on the other hand, what efforts he may have made to inform himself so as to arrive at a prudent and intelligent judgment on the subject. It would have been proper, and in fact his duty, to examine and consider, among other things, the assessments in judging of the value of the lands, and we have already seen that, in so far as he may have relied upon these, they would have shown very little depreciation in his margin, even in the face of the earlier liens. There is indirectly some affirmative evidence that he was vigilant and inquiring on this subject furnished by the letters of W. W. Hopkins, one of the heirs interested in the trust. These letters, moreover, show that if Mr. Lightner still considered the trust secure he was not alone; for Mr. Hopkins, with the highest personal concern in the subject, himself a man of large experience, and presumably having heard these lands much discussed as private secretary to Mr. Thome, the holder of the earlier liens, as late as 1888 values these lands to Mr. Lightner at $55,000.

In the language of Justice CLARK: "It is a fact known to all, that there is no article of commerce which admits of as varied and uncertain judgment, as to value, even among the well informed, as real estate. There are so many elements or factors entering into a proper estimate, matters present and prospective, that a correct judgment is with difficulty formed." Fahnestock's Appeal, 104 Pa. 46.

There is no evidence of bad faith on the part of Mr. Lightner, nor that he neglected to use proper means of getting reliable information on which to judge. And in the absence of such evidence the law presumes that he acted in good faith and with proper care, and, even though he may in fact have been in error in his judgment, he will not be held liable : Willis on Trustees, p. 168; Hinkle's Estate, 20 W. N. C. 351. In this respect the present case differs from that of Lechler's Appeal, 21 W. N. C. 505. There the trustee was held liable, because the evidence showed affirmatively that he had made no effort to inform himself.

But even assuming that Mr. Lightner knew and believed that these lands were depreciating, there are some additional

circumstances which must be considered in judging how he should have acted in view of it.

" In determining whether a trustee should be held liable for an unexpected loss resulting from an extraordinary shrinkage of values, especially of real estate, in that neighborhood, all the facts and circumstances should be taken into consideration :" Jack's Appeal, 94 Pa. 371.

In the first place we must consider the character of the trust as it stood in Mr. Lightner's hands. It was invested in the lands of the person who had the life interest, and the only persons interested in the remainder were his own wife and children. The trustee was the brother-in-law and uncle, and naturally would be reluctant to sell away from the family their homestead unless the wisdom and necessity of doing so were very apparent, especially in view of the fact that he would be doing it to save a fund in which they had exactly the same interest as they had in the land itself.

The family estate in which the court had ordered the money was a very large tract of land, too large to be saleable to good advantage as a whole. The prior liens held by others were of such size that no forced sale in parts could have been accomplished except by consent of the holder of these.

Manifestly it was to the interest of this whole family that, so long as the investment was not absolutely in peril, this large body of land should not be pushed to a forced sale. Such a sale, unless the trustee stood ready to protect the lands by purchase, would in all probability simply have resulted, as it actually did when it was finally made, in transferring the title to a stranger, and thus end disastrously for all parties in interest.

There is no evidence that they could ever, after the depreciation set in, have been sold as a whole, for enough to cover the liens, to any one but Mr. Thome or the trustee himself; and the inherent probabilities are against any such view. It is a plain business proposition that the only practicable way of getting the full value of the lands, which was all the more important if the margin was doubtful, was to sell in smaller tracts. This the evidence shows Mr. Hopkins and his family were trying their best to do during the later years of the trust, with the knowledge, and presumably with the counsel, of Mr. Lightner.

It must also be remembered that Mr. Lightner was a trustee for Mr. Hopkins as well as for his children. Presumably so long as the investment was safe beyond question these moneys were worth more to Mr. Hopkins and his family in their own lands than elsewhere. And when it became doubtful, if it did, Mr. Lightner may have properly considered that, with Mr. Hopkins and his family trying to sell the lands privately and meanwhile enjoying the whole income thereof, their interests all around were being better served than by forcing them to sale, unless it was clear that enough could be realized to pay the liens.

The situation was, moreover, further complicated by the great disadvantage at which the trustee would be in any forced sale, by reason of the large prior liens.

He could only have purchased the lands by raising this large sum of money, which is practically equivalent to saying that he could not purchase at all; and that in consequence the lands would go to forced sale without protection, and almost inevitably fall into the hands of Mr. Thome. He was under no legal obligation to use his own funds to do this, if he had sufficient funds, and there is no evidence that the parties in interest ever offered him the funds to protect the lands. This practical disadvantage, it is true, was one of the necessary incidents of an investment made on a lien subsequent to such other large judgments. But it must be presumed to have been considered by the court when it made the order, and is, therefore, within the scope of its protection. But while it is an element of danger for whose existence the trustee is not to be held liable, he was nevertheless bound to recognize it as a fact in deciding upon what would be prudent and proper for him to do.

It is easy to decide that Mr. Lightner was bound to know that the prior liens were accumulating, and to consider this as an element of danger. It would also be easy to suppose that he probably knew that there was some depreciation going on in the real estate during the last few years of his life. But considering all the circumstances of the case, and the difficulties of his position, we think it would not be safe to affirm that it was so clearly the proper thing for him to force these lands upon the market at sheriff's sale as to have made it gross negligence for him not to have done so. We think, on the contrary, that

it is doubtful whether such a course would have resulted in any good for the parties in interest; and, as the sequel has shown, would probably only have resulted in ruin and disaster both for Mr. Hopkins and his children, and in passing the title to Mr. Thome. As it was, Mr. Hopkins and such of his family who have lived with him have at least all these years continued to enjoy their home and the entire income of the lands.

The fact that these moneys were invested not in the land of strangers to the trust, but in family lands, in which the owners of the trust fund had, as the matter stood, the same interest as they had in the trust itself, is a circumstance which we cannot overlook. While this would not excuse Mr. Lightner from performing his duties as trustee, it would be a proper element for him to consider in judging of his duty.

The same may also be said of the joinder of those who were of age in making the original investment, and the constant subsequent approbation of the entire family in its continuance, and in the conduct of the trustee with reference to it. Although they were all of age for the last fourteen years of Mr. Lightner's life, and, so far as the testimony shows, in family relations with their father, and at least in as good position as the trustee to know his property, not one of them ever expressed a doubt to Mr. Lightner, nor a desire that he should force the land to sale. It would, of course, be easy to give too much weight to this fact, as Mr. Lightner was the person on whom the final responsibility for action rested, and not they. But it may at least be accepted and considered as some evidence going to show that they did not, while Mr. Lightner lived, look upon his management as grossly negligent. And, if so, it should now, in an effort in their behalf to hold his estate liable on this ground, after he is dead and unable to speak for himself, be given in a court of equity its proper weight.

" It is not too much to say that the family approbation of the appellant's course may legitimately weigh in a question of negligence : " Judge GIBSON in Jones' App., 8 W. & S. 143.

As to W. W. Hopkins, the eldest son, we have his letters in evidence showing his positive approval of Mr. Lightner's course, and advising him to a continuance in it, and it is hard to see how in any view of this case recovery could be had for his share.

In conclusion of the whole inquiry it may be remarked that it is a very hard case however decided, and one by no means free from doubt. The amount in controversy is large, and the loss, therefore, onerous to whichever party must bear it. But we are asked to do that which courts of equity are always loth to do, and which they never will do except in a clear case.

"It is the hardest demand that can be made in equity to compel trustees to make up a deficiency not owing to their willful default:" Johnson's Appeal, 12 S. & R. 317; Eyster's Appeal, 16 Pa. 372.

A court of equity always treats trustees acting in good faith with a great deal of tenderness: Calhoun's Estate, 6 Watts, 185. And they will not surcharge a trustee for a loss arising from a mere error of judgment when not guilty of willful neglect or default: Patterson's App., 104 Pa. 369.

The auditor has endeavored to give the facts in this case the patient and careful consideration which its importance demands. He finds no evidence of bad faith, and while not prepared to say that the trustee's conduct is in all respects free from errors of judgment, he is of the opinion that the evidence is not such as to warrant him in finding that Mr. Lightner was guilty either of willful default or gross negligence, and that the loss must hence fall upon the beneficiaries of the fund. The exceptions on this point are, therefore, all dismissed. And from this decision it follows that the payment of the costs of this audit must be charged on the exceptant.

The exception relative to commissions falls with this decision and need not be farther considered.

*Error assigned,* among others, dismissing exceptions to the auditor's report and confirming the same.

*W. U. Hensel, J. H iy Brown* with him, for appellant.

*George A. Lane,* for appellee.

PER CURIAM, May 28, 1896:

Newton Lightner was the executor of the will of Harriet Old, and testamentary trustee for James M. Hopkins during his life, and after his death for his widow and children and their heirs.

As such trustee he loaned the fund so held in trust to James M. Hopkins upon the security of a large body of land owned by him subject to several liens already existing. This loan was made with the approval and under the order of the orphans' court, and with the consent and approval of such of the remainder-men as were then sui juris. Hopkins and his family lived on the land, and it was regarded as ample security for all the liens against it. For nineteen years, until the death of Lightner, Hopkins was unable to pay him, or to pay the annual interest accruing on the previous liens; and at the end of this time the interest had accumulated to such an extent that the previous liens amounted with interest to more than could be obtained for the land or collected from Hopkins in any other manner. The descendants of Hopkins are now seeking to surcharge the estate of the trustee with the amount of the loan made by him to their ancestor, the life tenant. The ground on which this is urged is that it was negligence in the trustee to deal so generously with their ancestor, and not to have compelled him to do what it seems very clear he was unable to do, viz : to pay the interest annually on the liens that were prior to his own.

We have examined the findings of the learned master upon this subject, which have been concurred in by the orphans' court. No clear error in them has been pointed out to us. They seem on the other hand to be fairly justified by the evidence. Accepting the facts so presented, we concur in the legal conclusion that has been drawn from them.

The decree of the orphans' court is affirmed, the costs to be paid by the appellant.