## Casani's Estate.

Argued April 22, 1941. Before SCHAFFER, C. J., MAXEY, DREW, LINN, STERN, PATTERSON and PARKER, JJ.

*David D. Goff,* with him *Sidney Chait,* for appellant.

*S. Eugene Kuen, Jr.,* with him *Frederick V. Hebard* and *Clark, Hebard & Spahr,* for appellees.

*R. M. Remick,* of *Saul, Ewing, Remick & Saul,* with him *Charles C. Townsend,* of *Townsend, Elliott & Munson, H. Justice Williams,* of *Wintersteen & Williams, Roland C. Heisler, Thomas B. K. Ringe, Thomas Stokes,* of *Pepper, Bodine, Stokes & Schoch, Boyd Lee Spahr,* of *Ballard, Spahr, Andrews & Ingersoll, C. F. C. Arensberg,* of *Patterson, Crawford, Arensberg & Dunn, Drinker, Biddle & Reath* and *Morgan, Lewis & Bockius,* for amici curiæ.

OPINION BY MR. JUSTICE LINN, June 30, 1941:

This appeal, on behalf of minor remaindermen, is from a decree refusing to surcharge trustees for losses resulting from their failure to convert non-legal investments which had been received from themselves at the adjudication of their account as executors. Testator died September 13, 1930, leaving a will dated January 27, 1930, with a codicil dated June 2, 1930. After

directing the payment of debts, disposing of household effects, giving a number of cash legacies, creating three trusts of $5,000 each for grandchildren, directing the payment of taxes and the sale of his interest in a partnership, he disposed of the residue to his executors and trustees to pay the net income to his daughter for life, then to distribute the corpus to her children and his nephews and nieces in contingencies which need not now be stated.

Among testator's investments passing to the executors were non-legals,[1] of which they sold only a part. At the adjudication of the executors' account in October, 1931, they received the unconverted non-legals as trustees. In 1939, pursuant to the application of the life beneficiary, they filed their first account; at the audit, requests for surcharge were made and allowed; after argument on exceptions to the adjudication the surcharges were affirmed. Later, reargument was allowed, after which a majority of the judges sustained the exceptions to the adjudication, and refused the surcharge.

The general rule is that the trustee must exercise common prudence, common skill and common caution in the performance of his duties, or, shortly stated, due care in the circumstances.[2] The field of investment defined by the statute may be enlarged by the will,[3] by acquiescence[4] of beneficiaries, or in certain

---

[1] $6,000 4% General Consolidated Mortgage Gold Bonds, due 2003, of the Lehigh Valley Railroad Company, 50 shares General Electric Company Common, 200 shares Deposited Bank Shares, Series B. 1, 962 shares U. G. I. Common and 22 shares U. G. I. Preferred and 100 shares Union Traction Company.

[2] *Taylor's Estate,* 277 Pa. 518, 529, 121 A. 310.

[3] *Detre's Estate,* 273 Pa. 341, 117 A. 54; *Dickinson's Estate,* 318 Pa. 561, 179 A. 443.

[4] *Stephen's Estate,* 320 Pa. 97, 181 A. 559; *Brown's Estate,* 287 Pa. 499, 135 A. 112; *Curran's Estate,* 312 Pa. 416, 167 A. 597; *Clabby's Estate,* 338 Pa. 305, 12 A. 2d 71; *Shipley's Estate,* 337 Pa. 571, 12 A. 2d 343.

cases by order of court.[5] If the testator directs an investment in a particular security[6] it must be made, if available. If investments become non-legal or if non-legal investments are received without authority to retain them, they must be converted into legals[7] with reasonable diligence. The rule to be applied to this record was considered in *Taylor's Estate*, 277 Pa. 518, 121 A. 310 (1923), in *Brown's Estate*, 287 Pa. 499, 135 A. 112 (1926), and in more recent cases, among them, *Nola's Estate*, 333 Pa. 106, 3 A. 2d 326 (1939). In *Brown's Estate*, we said, at p. 501: "The rule stated in *Taylor's Estate* as to such securities was that a fiduciary should not hold beyond a reasonable period investments made by the decedent in unauthorized securities unless specially authorized to do so, and that when a trustee continues to hold such non-legal investments after a time when he could properly dispose of them and a loss occurs, he must be held liable for a failure to exercise due care; *unless he shows that his retention of the securities in question represents, not a mere lack of attention, but an honest exercise of judgment based on actual consideration of existing conditions;* in other words, he is expected to be ordinarily watchful and to exercise normal good judgment: *Taylor's Estate*, [277 Pa. 518] at page 528."[8] This accords with the requirement of section 49 (e) 2 of the Fiduciaries' Act of 1917, P. L. 447.[9] in *Nola's Estate*, the opinion

---

[5] See *Old's Estate*, 176 Pa. 150, 34 A. 1022; *Riebel's Estate*, 321 Pa. 145, 184 A. 118. Compare *Cridland's Estate*, 132 Pa. 479, 19 A. 362; *Catanach's Estate*, 273 Pa. 368, 117 A. 178.

[6] Compare *Nola's Estate*, 333 Pa. 106, 3 A. 2d 326.

[7] See, with reference to the law in a number of jurisdictions: Bogert, The Trustee's Duty with Regard to Conversion of Investments, 1 U. of Chicago L. Rev. 28; Note, 89 U. of P. L. Rev. 227.

[8] See also *Dempster's Estate*, 308 Pa. 153, 160, 162 A. 447; *Drueding v. Tradesmen's National Bank and Trust Co.*, 319 Pa. 144, 147, 179 A. 229.

[9] Amended by section 4 of the Act of 1937, P. L. 1037, 20 PS §

stated at p. 109: "If a decedent dies leaving securities which would not be legal investments for trust funds, the fiduciary is excused from a failure to convert them if his retaining them represents 'the honest exercise of judgment based on actual consideration of existing conditions; in other words, he is expected to be ordinarily watchful and to exercise normally good judgment.' *(Taylor's Estate,* 277 Pa. 518, 528; *Brown's Estate,* 287 Pa. 499; *Curran's Estate,* 312 Pa. 416, 423, 424; *Reinhard's Estate,* 322 Pa. 325). He is thus vested by the law with a measure of discretion and is allowed the exercise of his own judgment as to the wisdom of selling the securities under then prevailing market conditions." See, also, Restatement, Trusts, § 174.

As the trustees were not authorized to retain the non-legal investments, it was their duty to convert with reasonable diligence, which means within a reasonable time considering the circumstances; to perform that duty required them to determine what would be a reasonable time. While the dictionaries give a number of meanings for the word reasonable, in a legal sense conduct is reasonable if it is consistent with that of the prudent man in like circumstances. These trustees, then, whether advised that they should not hold the investments "beyond a reasonable period" *(Taylor's Estate,* 277 Pa. 518, 528, 121 A. 310) or that they should "use reasonable diligence in converting" (section 49 (e) 2, Fiduciaries' Act, 1917, P. L. 516) or that they should dispose of them "within a reasonable time" (Restatement, Trusts, section 230) were bound to conform to the prudent man standard. The required conduct must be considered with respect to the necessities, as they appeared at the time of the proposed transactions; obviously, for example, if there is no market, the trus-

866, by eliminating the sentence providing for conversion with reasonable diligence; see also section 1 of the Act of 1935, P. L. 545, 560, 20 PS § 801 (19).

tees cannot sell.[10]  If, temporarily, the appellees retained the investments, awaiting what they should consider a proper time to sell, they assumed the burden of justifying their decision; in the words of the rule, the record must show that their retention of the securities represented, not a mere lack of attention, but an honest exercise of judgment based on actual consideration of existing conditions. An examination of the record requires our concurrence in the decree appealed from.

The appellant has printed the evidence of two witnesses, John Casani, one of the trustees,[11] and William H. Loesche, a trust officer of the Girard Trust Company. For present purposes it is conceded that, as executors, the appellees were justified in retaining the investments until they filed their account in 1931; the learned auditing judge said that he was "not . . . prepared to say that these securities should have been sold by the trustees before the audit of that account." As the Fiduciaries' Act, section 49 (e) 1 and 2 provided that "for reasons satisfactory to said court" securities might be awarded in kind, the distribution in kind to the trustees was properly made.[12]

We come, then, to the evidence offered by the trustees to show the exercise of reasonable diligence in their endeavors to ascertain whether a time for sale had come at a price which should have been taken and in concluding that it had not; or, that the temporary retention, in the words of the rule, was not the result

[10] See *Dauler's Estate,* 247 Pa. 356, 93 A. 511; *Reinhard's Estate,* 322 Pa. 325, 185 A. 298.

[11] The testimony of Mr. Casani, as printed, contains what we assume is an inadvertent error; on pages 63a and 64a is printed as part of his evidence a part of the testimony of the life tenant, Mrs. Byrne, notes of testimony, pages 196, 197, 200, 201.

[12] See *Borell's Estate,* 256 Pa. 523, 100 A. 953, affirming 25 Dist. 430. Such distribution was justified prior to the statute: *Reed's Estate,* 82 Pa. 428 (1876).

of mere lack of attention but the product of the honest exercise of judgment based on actual consideration of existing conditions. Mr. Casani testified that he followed the market constantly and considered the fluctuating prices. He consulted about the investments with various persons connected with banks and brokers; he also consulted with S. Davis Wilson, then Controller of Philadelphia, with particular reference to the Union Traction Company stock, Mr. Wilson being then concerned in the Philadelphia street railway litigation. To quote only one of the instances given in the evidence, Mr. Casani testified, with respect to the investments generally: "Q. What kind of information were you getting from him? [a named broker]. A. What I was trying to get from these people all the time was that we had seen stock go below our appraisal figure. We knew it was non-legal and what we were trying to find out was if we could procure a judgment of what he would recommend us to do other than what we were doing with it. Nobody was telling us, 'You go out and sell it'; everybody was of the opinion 'These are good stocks; they will come back.' What we tried to do was to eliminate the sacrifice of assets in this estate." He said that both the trustees were following the quotations of these securities and watching them in the daily papers and investment journals.

In 1931 the trustees made an oral arrangement with the Girard Trust Company, the purport of which was thus stated by Mr. Loesche, trust officer of that company. "A. We entered into an agency agreement, where we have all the custody of the securities, collect income, and make the investments and reinvestments as they may direct. Agency service includes consultations with our trust officers concerning the assets of the estate." The trustees did not delegate power to the trust company; "everything in the handling of the trusts was done on their approval only." Among the duties performed were looking after the real estate,

keeping accounts, collecting income and distributing it to the life tenant accompanied by appropriate statements. For this service the trust company received 3% of the 5% charged for collecting the income, each of the trustees receiving 1%. The arrangement with the Trust Company continued during the entire period covered by the account. Mr. Casani testified: "When we talked to the Girard Trust Company about the position we were in they advised us to hold these securities." Mr. Loesche said, apparently speaking as of December, 1931, of the U. G. I. stock, "I remember saying to them I thought that was rather a sound stock; it was a rather large part of the estate, and probably the market conditions did not warrant selling at that particular time." He said that he "had many discussions with them relative to this estate." Mr. Casani testified that his reason for not selling the U. G. I. stock was that "in our judgment, for us to sell that stock would be to sacrifice a considerable asset, and we also felt that if we disposed of that stock for that price, which in our judgment was too low, and we re-invested in legal investments, the only ones that we would have considered, Federal bonds, that our income would have suffered a shrinkage and so we decided, felt in our judgment the thing to do, to protect the estate and also to protect the income, was to hold the U. G. I. stock." He said substantially the same thing of the General Electric Company stock, that "at thirty-one that it was too low and we would be sacrificing an asset to have sold it, and it would have reduced the income for the life tenant." There are similar expressions of their ultimate conclusions concerning other investments. We have of course not quoted all the evidence on the subject but it shows a case within the rule; their "retention of the securities in question represents, not a mere lack of attention, but an honest exercise of judgment based on actual consideration of existing conditions." These trustees, it may be noted,

were selected by the testator to carry out the purposes of the trust; one of them, Mr. Casani, was testator's nephew, engaged in business with him, and entitled to share in the remainder after the life estate, an interest that he would wish to protect. As the learned court has found that, in the honest exercise of judgment in conditions presented from time to time as disclosed by the record, they refrained from selling because they thought sales then would be at an unreasonable sacrifice in respect of both principal and income, they have complied with the rule.

Arguments in this and other surcharge cases at this Term appear to indicate that the decision in *Seamans' Estate*,[13] 333 Pa. 358, 5 A. 2d 208, has been misunderstood. In that case, as in this, the accountant had the burden of justifying his conduct; after considering his evidence, the court found "no adequate excuse for appellant's retention of the stocks ever since 1930." From that finding of fact liability followed as of course. That was the decision. The apparent misunderstanding of it appears to result from expressions selected from the opinion which certainly were not intended by the court to modify the rule[14] as theretofore applied. In the opinion, the words "promptly" and "prompt" were used in referring to the general rule requiring conversion; the words "to some extent" were added in a sentence

---

[13] In *Seamans' Estate*, the accountant was not a fiduciary selected by the testator, but a guardian appointed by the court.

[14] Mr. Justice STERN said at page 364 that a sale of non-legals is not required ". . . where the market is so restricted that it is reasonably impossible to sell the security; or where the offering of a large block of stock at one time would drastically break the market price; or where a security is abnormally depressed in value because of a general economic and financial collapse, so that a sale can be effected only at a sacrifice, but there is a reasonable likelihood of an early return to stable conditions which will restore the normal value. A fiduciary is not compelled to jettison seasoned investments during a temporary panic." See, also, *Gardner's Estate*, 323 Pa. 229, 236, 185 A. 804.

which, in *Nola's Estate,* 333 Pa. 106, 109, 3 A. 2d 326, read as follows: "He is thus vested by the law with a measure of discretion and is allowed the exercise of his own judgment as to the wisdom of selling the securities under then prevailing market conditions," so that it read "and allowed to some extent to exercise his own judgment" etc. Apparently, also some of the misunderstanding results from the fact that one year after the guardian received the securities at the audit of the executor's account was fixed as the date when the replacement value of the securities should be calculated. It has been argued that the rule referred to in *Taylor's Estate, Brown's Estate* and *Nola's Estate,* supra, was modified by the decision in *Seamans' Estate.* The words "promptly" at page 363, and "prompt" at page 364, used in the opinion in *Seamans' Estate,* and the addition of the words "to some extent" page 363, were not intended by the court to be given the effect suggested by counsel. In *Dauler's Estate,* for example, 247 Pa. 356, 93 A. 511, the accountant, an executor, was not surcharged though he held the securities six years without finding a market; in *Reinhard's Estate,* 322 Pa. 325, 185 A. 298, bank stock was held from 1930 until the bank failed in 1932; in *Stewart's Appeal,* 110 Pa. 410, 6 A. 321, railroad stock was held four years. While it is true that an executor should account in a year and may be required by the court to convert in a year for the purpose of then making distribution, the rule we are considering is that to be applied by a trustee after he has received the trust property at the audit of the executor's account.

The finding of the court in banc was as follows: "The record is replete with uncontradicted proof that [the trustees] consistently sought expert advice as to the wisdom of selling or retaining—always with the best interest and protection of the estate in mind. After the award to them as trustees in October, 1931, they continued this attention. In December, 1931, they en-

tered into an agency agreement with one of the largest
and soundest trust companies in order to 'collaborate'
with experienced men; they voluntarily surrendered
to that company 3% of their 5% commission for this
service. Not only did the trustees constantly and con-
tinuously consult with the officers and employees of
the trust company, but they consulted other bankers,
brokers, and a City official—all of whom advised and
evidently still advise against conversion. At no time
is it apparent in the testimony that the retention by
the trustee was by way of speculation, and to hold on
in order to receive a better price than the securities
were reasonably worth. Upon the contrary, the testi-
mony reveals that the retention was a bona fide effort
to retain until such time as a sale of the securities would
realize what the Trustees deemed to be their true value.
However mistaken their judgment may have proven—
a hindsight which may not be substituted for foresight—
there can be no question that these fiduciaries, to the
best of their ability, and with the assistance of the best
advice they could obtain, acted with common skill,
common prudence and common caution." There is no
contradiction of importance in the evidence.

Decree affirmed, costs to be paid out of principal.

Mr. Justice PARKER concurs in the result.

Mr. Justice DREW and Mr. Justice STERN dissent.

CONCURRING OPINION BY MR. JUSTICE MAXEY:

The opinions are unanimous that "a trustee must
convert non-legal securities *within a reasonable time*."
What is a "reasonable" time always depends on cir-
cumstances. It is a question *not of law but of fact*. As
this court said, speaking through Mr. Justice STERN,
in *Seamans' Est.*, 333 Pa. 358, 360: "There is no arbi-
trary or standardized formula which can be used as an
inflexible measuring rod . . . to enable a fiduciary
to determine his exact responsibility under various con-

ditions." This being so, the fact that a trustee retained non-legal securities for two years or for eight years or any other number of years has little or no bearing on the "reasonableness" of the retention. The question still remains: Did the circumstances warrant the retention?

In the law of negligence, for example, what is reasonable conduct depends on the attendant circumstances. Driving over a railroad crossing without stopping and looking and listening is negligent because reasonable beings do not (except in moments of aberration) do that sort of thing. Even primitive men and animals will *stop, look and listen* in the presence of seeming danger. In myriads of other human situations the questions of what is reasonable conduct is not so categorically settled and therefore *an adjudication* based on the facts must take place. Such is the situation in respect to the retention by a trustee of non-legal securities.

*All agree* that "non-legal securities should be converted promptly. *in the absence of exceptional circumstances".* This record, in my opinion, presents such circumstances. The testator died about eleven months after the beginning of the depression. Neither in his will made on January 27, 1930, nor in his codicil made on September 13, 1930, did he direct his executor or trustee to sell his non-legal securities at any given time. The executor's account was adjudicated in October, 1931, and the trustee then received the non-legal securities. At that time no one foresaw that the depression which began in October, 1929, would last a decade or more. Periodic depressions have always occurred in this and in all other countries and the records show that (excluding the 1929 depression) their average duration has been 5.3 years. Before 1935 none here lasted more than six years. In 1931 and 1932 the then chief magistrate of the nation announced frequently to the American people that "prosperity was

480

just around the corner." There was a virtual unanimity of expert financial opinion in 1931 and 1932 that the *market* value of securities was then far below their *intrinsic* values and that the worst of the depression was over. It is now generally agreed that "the bottom" of the depression was reached in 1932. The "era of low prices extending for eight years or more" which was not visible to the keenest *fore*sight in 1932 is visible to the most obtuse *hind*sight in 1941. The prevailing view in 1930, 1931 and 1932 was that the depression was "only temporary", that it was a "panic condition", and that it was "abnormal". In the light of history that conclusion then appeared to be sound.[1] Most people held on to their stocks as long as they could during the depression years (as did this testator during the eleven months of the depression which preceded his death) and millions of others in 1930 and in following years invested their money in stocks selling at prices generally considered abnormally low. In those times even the acknowledged prudence of an individual afforded him little or no protection against economic disaster. The circumstances were in that era so exceptional that this trustee in declining to sell the stocks in question at prices which he with good reason regarded as being far below their real value was, in my judgment, exercising, as the court below found, "common prudence, common skill and common caution."

In *Seamans' Estate* (supra) Mr. Justice STERN, speaking for this court, listed among the circumstances which "excused from the prompt sale" by a trustee of nonlegal securities the following: "Where a security is

---

[1] The greatest previous depression in this country was that of 1873. When President Hayes took office on March 4, 1877, he characterized in his inaugural address "the financial condition suffered during the past three years" as one of "embarrassment and prostration". Four years later his successor declared in *his* inaugural address: "The prosperity which now prevails is without parallel in our history."

abnormally depressed in value because of a general economic and financial collapse, so that a sale can be effected only at a sacrifice, but there is a reasonable likelihood of an early return to stable conditions which will restore the normal value. A fiduciary is not compelled to jettison seasoned investments during a temporary panic." From the point of view of this trustee, *those* circumstances existed when he refused to sell. The investments were certainly well "seasoned" and there was "a reasonable likelihood of an early return to stable conditions." All leaders in government and in finance were optimistic in their predictions as to the depression's early ending.

The majority opinion does *not* abolish the distinction between legal and non-legal securities in respect to their retention by a trustee. When a trustee retains legal securities, the presumption is that he is doing his duty and while he may be surcharged for any supine negligence in retaining even legal securities when he *should* sell them, those who charge him with such negligence have the burden of proving it. In such a case the trustee's discretion is wide and he will not be held liable for any losses which result from its honest and careful exercise.

If a trustee retains non-legal securities for a long period of time, he does so at *his* peril, for his determination of what is a reasonable time to retain the securities is subject to judicial review, and if his retention of the securities is challenged the burden of justifying it is his. All trustees of non-legal securities know this and govern their actions accordingly.

The majority opinion is *not* in conflict with *Seamans' Estate* (supra). That case, like this one, turned on a question of fact. The court below in that case held that the trustee "did not give to the management of the trust estate the care and judgment which he should have exercised" and this court in affirming (with modification) the decree said: "A reading of the record

482

does not give the impression that he [the trustee] was seriously concerned with the responsibilities which his office as guardian imposed." A reading of the record in *this* case *does* give the impression that the trustee was seriously concerned with his fiduciary responsibilities.

What is said in the recent work of Scott on Trusts (1939), Vol. 2, sec. 230.2, is applicable here: "The length of time during which the trustee is justified in retaining securities depends upon a variety of factors. . . . Among the factors are . . . (5) the general state of the market, as, for example, whether the prevailing prices are generally considered unduly low in the case of a general depression or are considered unduly high."[2] Scott further says: "Where the trust estate includes securities which are not proper trust investments, the trustee is not liable for failure to sell them where panic conditions prevail, even though the securities have a ready market. The trustee is not bound to jettison securities. Any delay in the sale of securities which are not proper trust investments involves, to be sure, a certain element of risk. Although the trustee may reasonably believe that the securities will rise in price, there is always the chance that they may fall. For this reason the securities are not proper securities for the trustee to purchase for the trust. It is arguable that since the purchase would be speculative the retention is equally speculative, and that the trustee should be under a duty to sell them immediately. The courts, however, have very wisely refused to take this position. In a number of cases the court has pointed out that a trustee may be justified in retaining securities already in the trust although he would not be justified in making an investment in such securities. . . .

---

[2] Scott quotes *that* sentence from "Restatement of Trusts", sec. 231, Comment C.

"If the trustee is to escape a surcharge for a loss resulting from his delay in selling or failure to sell securities which are not proper trust investments, however, he must show that he has exercised a prudent judgment, taking into consideration all the relevant circumstances. If he has done so, the mere fact that subsequent events show that he was mistaken is not enough to subject him to liability."

Except for those acts specifically declared to be unlawful, a trustee's duty in respect to the retention of non-legal securities is determinable by the conditions confronting him. He must act under these conditions with "common prudence, common skill and common caution" as those qualities of mind are generally understood. This trustee did that.

I agree that the decree of the court below should be affirmed.

DISSENTING OPINION BY MR. JUSTICE DREW:

On its face this is an ordinary case in which an attempt is made to surcharge testamentary trustees, a comparatively small sum of money, for alleged negligence in failing to sell non-legal securities. That it is no ordinary case, but is one of extraordinary interest, is shown by the fact that about 136 trust companies, represented by an array of leading counsel, filed or joined in the filing of a brief amici curiæ. This was because our decision will vitally affect all fiduciaries in the Commonwealth.

Considered chronologically, the facts of the case as found by the learned auditing judge, a distinguished member of the Orphans' Court of Philadelphia County, are as follows: John Casani made his will on January 27, 1930, a codicil thereto on June 2, 1930, and died on September 13, 1930. A considerable part of his estate consisted of non-legal securities. Although he lived through a part of the national economic depression, which began in October, 1929, and although

he made his will during its continuance, and did not die until almost a year after it started, he did not authorize his executors or trustees to retain the non-legal securities in his estate. After testator's death, the trustees did not convert the securities, even after they had received them as trustees from themselves as executors, and year after year, although most of them were daily marketable, they did not convert them, and after seven years of such failure, in December, 1938, the petitioner, Caroline V. Byrne, a life tenant, for herself and minors, interested in the estate, filed her petition demanding an accounting and surcharge. The burden of proof was upon the trustees to show that they had acted according to law in retaining the securities, and the auditing judge concluded they had not maintained that burden and surcharged them.

The record clearly shows that, after a full hearing, the auditing judge found, that these trustees had not shown any legal justification for their failure to convert the non-legal securities within a period of seven years. He found, that without any authorization to do so, the trustees retained these securities for this long period of time; and doubtless this finding was based, inter alia, on the testimony of John Casani, one of the trustees, that they were determined not to sell them until they returned to their inventory value. He testified that "regardless of what loss may be incurred, or regardless of what the operating statement of the company showed", he was "still of the opinion that they should still hold that stock". I have carefully examined the record and found that the findings of fact are convincingly supported by the testimony. The auditing judge applied the principles of law applicable to the facts as stated by this Court in *Seamans' Estate,* 333 Pa. 358, and properly directed a surcharge. Exceptions to the adjudication, after argument, were dismissed by the court en banc, and the adjudication affirmed, with a slight modification not pertinent to

the question here under consideration. In its opinion, the learned court below said, inter alia: *"Seamans' Estate,* however, definitely rules that the fiduciaries, no matter how dutiful and vigilant, in the absence of exceptional circumstances (and there are none) must *promptly* convert non-legals. We are unanimously of the opinion that the auditing judge, under existing authority, was constrained to rule as he did. We find no error in his findings of fact and conclusions of law, which we affirm." Three months later that court, on its own motion, directed a reargument, and some months thereafter rendered another opinion (to which Judge BOLGER, and Judge LADNER, the auditing judge, entered a vigorous dissent), in which it reversed its former decision, disregarded the findings and conclusions of the auditing judge, and sustained the exceptions of the trustees. In explanation, the court said in its second decision: "After our decision (supra), and before appeal, the Supreme Court filed two opinions: *Clabby's Estate,* 12 A. 2nd 71 [338 Pa. 305] and *Shipley's Estate,* 12 A. 2nd 343 [337 Pa. 571]. As these cases employ language which is apparently at variance with what was written in *Seamans' Estate,* this court, upon its own motion, directed a reargument." Thus, it clearly appears that the learned court would have refused a reargument and would have stood upon its original decision, affirming the adjudication of the auditing judge, were it not for the sole fact that it was of the opinion that we had reversed or modified controlling legal principles enunciated in *Seamans' Estate.* The view of the court in this respect was entirely mistaken. The majority opinion of our Court, concurred in to this extent by this dissent, shows that *Shipley's Estate* and *Clabby's Estate* are distinguishable on their facts from *Seamans' Estate,* and, further that *Seamans' Estate* has not been overruled or modified. In *Clabby's Estate* there was power given by the will to the trustee to dispose of the non-legal securities

at his discretion and also there was acquiescence on the part of the beneficiaries for the trustee to retain them. In neither the present case, nor in *Seamans' Estate,* was there either authority given to retain or acquiescence. We said in *Clabby's Estate* (p. 314): "The case of *Taylor's Estate,* 277 Pa. 518; *Kelch's Estate,* 318 Pa. 296, and *Seamans' Estate,* 333 Pa. 358, have no direct application because they involved the retention of non-legal securities by fiduciaries who had no such discretionary power." In *Shipley's Estate* there was complete acquiescence on the part of the beneficiary and, for that reason, *Seamans' Estate* was not in point. It seems to me the only thing now to do, in this situation, is to remit the record to the court below so that it may correct its error and reinstate the adjudication of the auditing judge as originally confirmed by it. Instead, however, the majority of our Court has affirmed the second decision and absolved the trustees of all liability.

There is nothing in *Seamans' Estate* that should have induced anyone to believe that we there fixed one year as the period in which non-legal securities must be converted. We said no such thing. It would be a very casual reader who would conclude that by the use in a footnote of Comment b, section 230, Restatement of Trusts (which itself does not fix a year as the rule) we meant by the reference that we so intended. Our prior cases show that we could have had no such intention. In *Seamans' Estate* one year was the time fixed in which conversion should have been made; in *Stewart's Appeal,* 110 Pa. 410, we said that almost four years was not too long under the circumstances to have held the securities; in *Borell's Estate,* 256 Pa. 523, it was decided that two years after death of testator was a proper time; and in the present case the auditing judge fixed three years as the time in which the trustees should have converted. In *Seamans' Estate* we

held, following and amplifying the existing law, that a trustee must sell non-legals promptly, that is, within a reasonable time, and that what is to be determined in a given case as a reasonable time depends upon the facts and circumstances of that case; in other words, that non-legals must be sold promptly or with reasonable diligence, unless there is authority to retain, acquiescence of beneficiaries, or other unusual circumstances. We decided that, under the facts there presented, one year was a reasonable time in which those trustees should have sold. In that connection we said (p. 366) : "Certainly by the end of a year after he received the stock . . . appellant [trustee] should have realized that the probable duration of the depression could not be foretold, but that it certainly was not merely a temporary condition and that any conclusion as to whether stocks would recover or sink to still lower level could be based only on guesswork."

While it is true that non-legals must be converted within a reasonable time, or with reasonable diligence or promptly, whether they have been so converted is a question of law and not one of fact, under all the circumstances. It is not to be left to the discretion or determination of the fiduciary alone. There is no doubt a trustee must determine the time to sell or hold, *but he does it at his own risk,* and is liable if later it is found that he did not convert promptly under all the circumstances. The majority opinion seems to ignore the requirement of prompt conversion. It does not place such condition in the "general rule", which it claims to be "common prudence, common skill and common caution". It makes ordinary negligence the rule of liability, seeming only to require good faith. This destroys the fundamental difference between legals and non-legals. It makes no distinction between authorization to retain and where no such authority is given. In short, in my view, all the benefits and pro-

tection now given such beneficiaries is destroyed by the removal of the distinction between legal and non-legal securities, thus permitting fiduciaries to treat both types alike, and as if they were their own property. In *Seamans' Estate* we said (p. 362) : "Notwithstanding the broad tenor of some of the language thus quoted, a fiduciary is not justified in inferring that the principle which exempts him from liability for acts performed in good faith and with ordinary prudence necessarily applies wherever there is a failure to convert non-legal securities within a reasonable time. The law imposes limitations upon 'ordinary prudence' in such cases in order to preserve the differentiation between non-legal and legal securities, and between fiduciaries and others as to the right to speculate. The mere fact that a trustee may honestly believe that an unauthorized security will appreciate in value at some more or less remote period is not sufficient justification for his retention of it in the trust estate, and 'common prudence' or 'normally good judgment' must not be deemed to confer such latitude of discretion."

It was not until *Taylor's Estate,* supra, in 1923, that this Court was called upon to declare the established law regarding the retention of non-legal securities by a trustee. What we there said, speaking through Chief Justice MOSCHZISKER, was followed in *Seamans' Estate* with care and precision by Mr. Justice STERN, as has already appeared. The majority opinion, and this dissent, agree that *Seamans' Estate* is the law of the Commonwealth, and, therefore, it is difficult for me to understand why we should not all agree that that case rules this case, since the facts of the two cases are almost identical.

With the exception of *Taylor's Estate* and *Seamans' Estate,* the cases mentioned in the majority opinion do not seem to me to be applicable to the facts and circumstances of this case. I have taken them up in the

order in which they appear in the majority opinion and briefly stated why each case is distinguishable.[1]

Let us consider briefly the testimony in the case. The will was silent as to the nature of the investments to be held for the benefit of the residuary trust. In October, 1931, upon audit of the account of Collins and Casani as executors, certain non-legal corporate stocks and bonds which had comprised part of the investments which testator had made in his lifetime were awarded in kind to them as trustees. On February 1, 1939, they, at the demand of the life tenant, filed their first account, showing that they had retained the greater part of these securities and that they were then of greatly impaired value. The life tenant and the trustee ad litem demanded a surcharge. The auditing judge, considering each of the securities separately, found that by October, 1933, it was apparent that there was no

---

[1] *Brown's Estate,* 287 Pa. 499 (agreement of beneficiaries to retain and also large discretion granted under will); *Detre's Estate,* 273 Pa. 341 (power given to trustee to invest and beneficiaries approved purchases); *Dickinson's Estate,* 318 Pa. 561 (trustee authorized to retain); *Stephen's Estate,* 320 Pa. 97 (sole beneficiary requested postponement of conversion); *Curran's Estate,* 312 Pa. 416 (acquiescence); *Clabby's Estate,* supra (acquiescence and power to retain); *Shipley's Estate,* supra (acquiescence); *Old's Estate,* 176 Pa. 150 (acquiescence); *Riebel's Estate,* 321 Pa. 145 (court authorized retention); *Cridland's Estate,* 132 Pa. 479 (investment such as law permits); *Catanach's Estate,* 273 Pa. 368 (agreement of parties); *Nola's Estate,* 333 Pa. 106 (direction of testator to sell at stipulated time); *Reinhard's Estate,* 322 Pa. 325 (no market); *Dempster's Estate,* 308 Pa. 153 (large power under will and no market); *Drueding v. Tradesmens National Bank and Trust Co.,* 319 Pa. 144 (trustee executed loan agreement); *Dauler's Estate,* 247 Pa. 356 (no market); *Borrell's Estate,* supra (held two year retention by executor, under circumstances presented, not sufficient for surcharge); *Gardner's Estate,* 323 Pa. 229 (broad powers of retention and acquiscence); *Stewart's Appeal,* supra (held retention for four years by executor, because of particular facts, not sufficient for surcharge).

490

reasonable likelihood of an early return to stable market conditions which would restore normal values and therefore, at that date, a reasonable period had elapsed for the conversion of the non-legal securities into investments authorized by law and that the trustees must be surcharged for not having by that time effected such conversion. Just as in *Seamans' Estate*, the trustees here in December, 1931, turned over the possession of the securities to a trust company under an agency agreement whereby the latter collected the income, made investments (subject to the approval of the trustees) and provided an advisory service. The same inference raised there that the trustees must therefore have felt that they were relieved of the duty of watchful observation is equally applicable here. And similarly, the testimony of the trustees that they watched quotations, consulted with officers of the trust company, and sought the opinions of others as to the desirability of retaining these securities, is not convincing of their desire to comply with the legal requirement of prompt conversion nor a proper excuse for failure to do so. A witness, called in the trustees' attempt to have corroborated the fact that they had sought the advice of experts, instead contradicted the trustees in material respects. That these trustees deliberately, and even stubbornly, retained these securities when they knew or should have known they were bound to sell, is clearly manifested by Casani's testimony, that he was determined not to convert the investments until they had returned to their inventory value, irrespective of what losses were incurred and regardless of what the operating statements of the various corporations showed from time to time. Moreover, Casani, who undoubtedly was the dominant trustee, treated the securities almost as his own property. He had a remainder interest in the trust principal and hence might be inclined to engage in speculation in the hope of regaining some of

the lost value. These trustees did not consult with the life tenant or any other beneficiary, during this extended period during which they retained the securities, in order to ascertain their desires and wishes in connection with such retention. Testator did not authorize the retention of the securities and therefore it must be presumed that he intended the trustees to follow the course which the law required of them, especially since his will was executed in 1930, after the depression had set in and stocks and bonds were, to say the least, most unstable. All the securities were marketable at all times, and yet for years the trustees retained them in face of failing dividends and decrease in values. Thus, they treated the securities as legal investments, and ignored their duty to convert promptly or within a reasonable time.

The facts of this case show such a breach of duty by the trustees, that it matters little the rule of law applied; if it be merely that mentioned in the majority opinion, "common prudence, common skill and common caution", they should be surcharged. Any higher requirement of duty would only accentuate their negligence, and make more certain the necessity for a surcharge.

I would reverse the court below, and reinstate its first adjudication.

DISSENTING OPINION BY MR. JUSTICE STERN:

The phrase on which is built the whole structure of the court's opinion is that a "trustee must exercise *common prudence, common skill and common caution* in the performance of his duties." With that slogan[1]

---

[1] When it is said that a trustee must exercise common prudence and caution there is obviously meant the prudence and caution rightly demandable of one who *is* a trustee and is therefore not dealing with his own property. In other words, a trustee must act not merely as a prudent *man,* but as a prudent *trustee.* See 89 U. of P. Law Review 229.

no one can quarrel, but it amounts to scarcely more than a truism. It is a generality which applies to *every* act, of whatever nature, which a trustee is called upon to perform, but there are also, of course, a multitude of special rules, or requirements of the law, governing *particular* problems of trust administration. While the phrase in question may constitute sufficient guidance for the conduct of a trustee who is authorized to retain non-legal investments[2] it certainly does not express the exact or categorical duty of one not so authorized.

From the law of negligence there may be advanced an analogy. There the general principle is that every one must act with "ordinary care." But the law does not rest content with this generalization, which is obviously too vague to serve as a standard of conduct in particular instances. Accordingly, in its application, it is crystallized into subordinate rules which fix absolutely and precisely the requirements of "ordinary care" under particular circumstances; for example, that before crossing a railroad track one must stop, look and listen, and in alighting from a car one must wait until the vehicle has come to a stop.

At the outset, therefore, it is necessary to ascertain what the exercise of "common prudence, common skill and common caution" specifically requires of a trustee in regard to non-legal securities included among the assets of the trust at the time of its inception where no authority to retain such securities has been given. To this question the authorities give practically a unanimous answer, namely, *that he convert them within a reasonable time:* Restatement of the Law of Trusts, section 230. In the majority opinion it is said that

---

[2] "The law is clear that where (as here) a trustee is *authorized to retain* the settlor's non-legal investments, and in so doing exercises reasonable skill, prudence and caution in the management of the estate and is guilty of no bad faith, no surcharge will be imposed": *Dickinson's Estate,* 318 Pa. 561, 563, 179 A. 443, 444.

"if non-legal investments are received without author-
ity to retain them, they must be converted into legals
with reasonable diligence," but it is explained that
"with reasonable diligence" means "within a reason-
able time considering the circumstances."

We thus arrive at the real crux of the present prob-
lem—"What *is* a "reasonable time" in which to con-
vert?[3] In determining that question there is need again
for greater particularization, because, in the domain
of law, a "reasonable time" varies widely according to
the particular field to which it is applied, ranging, for
example, from 24 hours in which to deposit a check
to several days, months, or even years in which to seek
redress at law or in equity for various types of griev-
ances. In *Seamans' Estate*, 333 Pa. 358, 5 A. 2d 208,[4]
where the doctrine of "reasonable time" was accepted
as the governing principle established by the authorities,
it was pointed out that there is "no rigid criterion"
as to the time in which a fiduciary must convert non-
legals, and that "each case must depend largely upon
its own circumstances," but that, *in the absence of ex-
ceptional circumstances,* they should be converted
promptly. Under the facts of that particular case it
was held that a year was the limit of time in which
the securities should have been converted, but there
were suggested various types of conditions and circum-
stances under which a fiduciary would be excused from
converting non-legals within that or any other definite
period.

---

[3] The majority opinion says that "to perform that duty [to
convert within a reasonable time] required them [the trustees]
to determine what would be a reasonable time." I cannot con-
ceive that the trustees themselves should be the final judges in
that regard; if they had such power it would be without parallel
in the law, since in every other case where there is a standard
of "reasonable time" it is for the court, under established facts,
to say what constitutes it.

[4] For discussions of this case see 89 U. of P. Law Review 130;
89 U. of P. Law Review 227; 15 Temple Univ. Law Quarterly 269.

494

It is in its application of the rule of "reasonable time" to the facts of the present case, that, to my mind, the majority opinion represents a complete departure not only from *Seamans' Estate* but from all other Pennsylvania authorities, and from those, generally speaking, of other jurisdictions. Here the trustees retained non-legal securities from the time they received them in the trust until the audit of their account, a period of approximately eight years, and apparently they are still retaining them. The result is that Lehigh Valley R. R. bonds, inventoried at $91\frac{5}{8}$, declined to a low, when the account was filed, of $11\frac{1}{2}$; General Electric Company stock from an inventory value of $71\frac{7}{8}$ to a low of $27\frac{1}{4}$; United Gas Improvement Company stock from an inventory appraisement of $36\frac{3}{8}$ to a low of $8\frac{3}{4}$; Union Traction Company stock from an inventory price of $26\frac{5}{8}$ to a low of $1\frac{5}{8}$. All these securities were listed on the exchange and could have been sold at any time on a telephone call to a broker. Why were they not sold? One of the trustees testified that "we were merely trying to get for this estate the inventory figures of 1930." And on what did the trustees rely as justifying the optimism which this objective implied? The information they received by "following the market" and interviewing brokers. The gist, therefore, of the present decision is this: that a trustee, having no authority to retain non-legal investments, may nevertheless hold them for eight years, and presumably for any greater length of time, if stock brokers advise him that in their opinion better prices might be obtainable at some more or less remote period in the future. If this is not speculation I fail to discern the difference, for I do not see how it is distinguishable from that of any individual owner of securities who holds them in the hope or expectation that they will rise in price. We are not dealing here with the situation referred to in *Seamans' Estate,* of a security

"abnormally depressed in value because of a general economic and financial collapse, so that a sale can be effected only at a sacrifice, but there is a reasonable likelihood of an early return to stable conditions which will restore the normal value." How can any one pretend that an era of low prices, extending for eight years and more, represents a temporary depression due to a panic or other abnormal situation? How can any one say that a higher range of prices prevailing over a course of years indicates any more the "real" values of securities than a lower range existing over another long period of years? How can any one claim that the prices of securities in "boom" years, years of financial hysteria, are more truly representative of intrinsic values than the prices prevailing in duller or more conservative periods? If these trustees are to be allowed, as apparently they are by the present decision, to continue to hold non-legal securities until they realize "the inventory figures of 1930," what likelihood is there that the securities will *ever* be converted?

There is another question which inevitably arises from a reading of the majority opinion, namely: What is the difference, if that opinion correctly represents the law, between the obligation of a trustee to convert non-legal securities in a case where he is *not* given authority to retain them and one where he *is* given such authority? In the opinion of the court this day handed down in *In the Matter of the Estate of Thomas Clews Stirling, Deceased*, in which it is held that the fiduciary *was* given authority to retain non-legals, the duty to convert them was properly said to be measured by "common prudence, common skill and common caution."[5] In the present case, where admittedly no such authority was given, only the same measure of duty is applied, and no adequate attention is paid to the additional and

[5] See note 2.

more positive obligation of conversion within a reasonable time.[6] Certainly no one has heretofore supposed that the express grant by testators of authority to their executors and trustees to retain or to invest in non-legal securities is a provision which adds nothing to the powers which such fiduciaries would otherwise enjoy. On the contrary, every intelligent testator has presumably had in mind that his executors and trustees would not be allowed by the law to retain such securities unless permission was given in the will.

In conclusion, I think it can confidently be stated that there is no case in the books, as far as the law of Pennsylvania is concerned, which goes to the length of the present decision in exonerating a fiduciary who, without authority to retain non-legal investments salable at all times on a public exchange, nevertheless retains them for eight years and indefinitely into the future, merely in the hope or belief, based on the opinions of stock brokers, that they will again reach values attained years before during a notoriously speculative period.

I would affirm the original decision of the court below in banc, and would reverse the subsequent conclusion reached by a majority of that court on re-argument.

---

[6] It is true, as previously stated, that the majority opinion *recognizes* the duty of a trustee to convert non-legals "with reasonable diligence," but the standard by which it *actually* judges the conduct of the trustee in this case is merely "common prudence, common skill and common caution," or "due care in the circumstances."