## Williams' Estate

208

210

216

218

*Shields, Clark, Brown & McCown,* for exceptants.

*R. M. Remick,* of *Saul, Ewing, Remick & Harrison,* contra.

BOLGER,. J., May 1, 1942.—We are all satisfied that the auditing judge has correctly construed paragraph 2(*b*) of the settlement agreement of April 17, 1940, as releasing and exonerating decedent's widow from all

liability for Pennsylvania inheritance and Federal estate tax on premises 7029 Clearview Street, and as imposing liability for all such taxes on the residuary legatee.

We are, however, not in agreement with the second aspect of the adjudication. It holds (1) that Mrs. Williams, the widow, having married testator after the date of the execution of his will takes equitable title to one half of every specific article of personal property except as to such assets as it was necessary to convert to pay taxes, administration expenses, and creditors; (2) that the failure of the executors to consult the widow before liquidating certain assets prior to the audit of their account was in derogation of her right to take in kind; (3) that she might exercise that right at the audit; (4) that the executors were therefore negligent and by reason of their inability to produce the assets at that time, they being unable to purchase except at enhanced market prices over that obtained at sale, they should be surcharged; (5) that the conversion was not made in reliance upon any act of the widow.

This legal concept of the widow's rights and of the executors' duties, as stated, disregards the equities of the case and is predicated upon fixed and inflexible principles of law. We disagree with the auditing judge not only in his approach to the decision of the case, but also in his findings of fact and conclusions of law.

The language of the introductory paragraph of section 1 of the Intestate Act of June 7, 1917, P. L. 429, does not depart from its immediate antecedents: section 1 of the Acts of April 8, 1833, P. L. 315, and of April 1, 1909, P. L. 87; see also discussion in Report of the Commission Appointed to Codify and Revise the Law of Decedents' Estates, pp. 17 and 18. It provides that "the real and personal estate . . . remaining after payment of all just debts and legal charges, which shall not have been sold, or disposed of by will, or otherwise limited by marriage settlement, shall be divided and enjoyed

. . ." by those entitled. It clearly states that the estate that remains after payment of debts and legal charges which *shall not have been sold* or disposed of, etc., "shall be divided and enjoyed". The adjudication plainly overlooked the underlined phrase which is one of the important aspects of the administration of an estate. Furthermore, the phrase "divided and enjoyed" does not necessarily mean a disposition in kind prior to adjudication—in fact, a distribution in kind is impractical in many instances, as where the asset is single or otherwise indivisible and where there is more than one distributee, as we have in this case. This provision does not bestow title, legal or equitable, upon this widow or any other distributee in any specific personal asset of the estate. It gives to the widow a right in the collective property of the estate, that is a distributive share of so much as remains after administration, in accordance with the award contained in the auditing judge's adjudication. Such award is tantamount to judgment of ownership which, so far as specific assets are concerned, becomes absolute when confirmed—not at any time theretofore.

Real property and personal property continue to descend differently. As held in Cooch's Estate, 17 D. & C. 480, cited in the adjudication, title to real estate descends in every parcel thereof directly to the heirs without the interposition of a fiduciary. It is true that direct distribution of personalty to heirs without intervention of an administrator has been upheld, but only in cases where after long lapse of time it appears there are no creditors and the heirs have agreed: Walworth v. Abel, 52 Pa. 370. However, from Gallagher's Estate, 76 Pa. 296, through Lonergan's Estate, 303 Pa. 142, it has been the law that "The entire personal estate, bequeathed or not, vests in the executor in trust for administration and distribution. . . ." The auditing judge disclaims the application of Gallagher's Estate, supra, with the statement that it does not involve the

right of executors to sell assets without notice to or consent of the beneficiaries. The cited case, however, involves directly the question of title to specific personalty, a mortgage in the estate, and holds that the widow taking against the will had no right to one half of the mortgage specifically, that "the title of the widow is under and through the executor just as it would be under and through the administrator if there was no will". She could maintain no action against any stranger for any part of it. See also Merchants-Citizens National Bank, Exec., v. Mauser et al., 297 Pa. 399. From at least as far back as Lee v. Wright et al., 1 Rawle 148, any heir attempting to hold an asset of an estate has been characterized as an intermeddler and held liable as executor de son tort. In Mamaux's Estate, 274 Pa. 533, 539, Gallagher's Estate is construed and cited for the proposition that the widow (taking against the will) was not entitled to receive her share out of any particular fund. It is unquestioned that, so far as title to personalty is concerned, a widow taking against a will acquires the same interest in an estate as one who married the testator after the execution of his will—that is such interest as she would acquire had testator died intestate.

In limiting these accountants to the right to convert only such assets as would yield sufficient to pay taxes, administration expenses, and just debts, the auditing judge has overlooked a very important consideration. How could the accountants know in advance of the audit of their account—almost ten months after they assumed their office—the nature, character, and extent of the debts of the estate when the law does not require creditors to make known or to prove their claims until the audit? By what should they, therefore, have guided themselves other than the ordinary rule to convert everything save that which was expressly requested to be retained? In these days when mortgage bonds and other ghost obligations make their appearance only too

frequently at audits, to the consternation of parties as well as of accountants, this feature of the case assumes real importance. Had there been such creditors who appeared at the audit and their claims could not be paid because insufficient personalty had been sold, the accountants would have been surchargeable at their instance. Against this possibility the accountants were justified in protecting themselves under the circumstances.

Vernon's Estate, 225 Pa. 368, is cited as supporting the conclusion of the auditing judge. We do not so regard it. Examination of the record in that case reveals that the widow who elected to take against the will, *following the audit of the executors' account*, petitioned for a distribution in kind. The auditor, citing Reed's Appeal, 82 Pa. 428, where a residuary legatee was held entitled to distribution in kind, made the award and was sustained by the Supreme Court. No one doubts this proposition, which we have uniformly followed, but we have never directed distribution in kind prior to an audit (except as exemption or allowance) and the cited case does not authorize such practice. The question of the widow having title of any kind did not enter the consideration of that case nor was there any question of surcharge for sale of assets without notice to the widow.

Considerations of stare decisis require investigation into the practical effect of our decision upon the rights of other persons occupying similar position in other cases, with that of the widow in this case. To hold that the widow here has an interest in specific property and that she may wait until the audit of the executors' account before exercising it would open the door to sources of unutterable controversy and confusion. A few instances will serve to illustrate. What should a fiduciary do when, before audit of his account, conflicting claims to title and distribution in kind are presented by a widow, as here, and an afterborn child

(claiming under the same sections of the Wills Act of June 7, 1917, P. L. 403, and section 1 of the Intestate Act of June 7, 1917, P. L. 429), or a residuary legatee; and how should an administrator act at such a time when the said property is claimed by all of many heirs? What should such fiduciary do when one party wants such assets sold and another occupying similar position objects, where some of several distributees having equal interest desire the same asset, whereas a handsome price might be obtained from selling it, and failure to take advantage of such sale might result in surcharge at the instance of the other parties having equal interest? This court would be unable to afford comfort or advice to the executors in such a position because under the authority of Rebmann's Estate, 338 Pa. 120, we have no jurisdiction to consider questions of this kind prior to audit of the executors' account. Another pertinent observation is that, if the widow had title of any kind in every specific asset, she might with propriety claim at the audit that the executor had sold the wrong assets to pay debts and charges; that she wanted them in kind and that other assets should have been sold for administrative purposes. An adroit widow could thus play "cat and mouse" with an estate at the expense of the executor. Under such conditions, no responsible business man—the type the court desires to have serve as fiduciary—would consent to serve. On the other hand, the principles laid down in the cited line of cases of which Gallagher's Estate, supra, appears the leading one, safely guide in an orderly and equitable manner the work of executors and administrators, and at the same time protect the interests of all distributees.

The legislature, in defining the rights of a widow who married her husband after the execution of his will, has not prescribed the mechanics nor fixed a time limit for the exercise of such right as it has in the analogous instances of widow's exemption and allowance (both of which were claimed by Mrs. Williams

and allowed to her), and of a widow taking against the will. For a widow to effectuate these latter rights under the Fiduciaries Act and its amendments, she must observe strictly the procedure laid down in the statutes, including the primary requisite of notice to the executor. Davies' Estate, 146 Pa. Superior Ct. 7, reviews the cases dealing with the loss by widows of their highly preferential right of exemption due to laches. From them and other relevant authorities, it is clear that the burden of giving notice rests upon the widow and not upon the executor or administrator and that, although it is a preferential right, it must be exercised promptly or otherwise it will be lost. The same requirement holds true with respect to the right of a spouse to take against the will: Taylor's Estate (No. 1), 24 D. & C. 512, where this court ruled that no obligation rests upon an administrator to notify an alleged husband of his rights in his wife's estate. In Minnich's Estate or Sherwood's Estate, 288 Pa. 354, 357, it was held that the executor deals at arm's length with a surviving husband in connection with the latter's exercise of his right to take against his wife's will. In Walters' Estate, 12 Dist. R. 122, an order allowing a widow's exemption out of the proceeds of sale of personalty was opened where there was insufficient cash on hand to pay it and the widow ordered no appraisement. The court said the very purpose of the appraisement is to avoid a sale and her failure to order the appraisement was fatal. This case inferentially holds that the executors were not surchargeable for selling personalty without notifying the widow. We think, therefore, that we should not go further than the authority of this legislation and of these cases by exempting the widow from giving notice and doing so seasonably.

Were we therefore to decide the case by the application of an inflexible rule of law, we would hold that the burden was upon the widow to advise the executors promptly of any additional items of personalty she de-

sired to take in kind rather than to put the obligation of notice upon the executors. It does not follow that the duty or the authority of the executor to sell the assets is absolute. If it were it would oftentimes result in extreme hardship to beneficiaries, especially in cases where the estate included assets of a purely personal or sentimental character, where the cash requirements plus a reasonable apprehension of the amount of debts did not require conversion at a sacrifice to the estate, or where the executor might be similarly held to have abused the broad discretion vested in him: see Tyson's Estate, 80 Pa. Superior Ct. 29, and the other related cases cited in the adjudication. The rule, therefore, reduces itself to the general one that *ordinarily* it is the duty of the executor to convert personalty, and in the administration of this responsibility as well as of the others associated with the position he is required to exercise common skill, common care, and common caution. Our approach to the solution of the case is, therefore, the equitable one guided by the foregoing principles of law.

Testator died December 15, 1939. He left an elaborately and carefully drawn will. The executors, following their qualification on April 24, 1940, filed their inventory and appraisement and on November 7, 1940, Mrs. Williams, the widow, through her attorney, Mr. Remick, filed her petition for exemption of $500, claiming certain household and personal articles. In the meantime, the executors consulted with her and with her attorney about certain assets of the estate, principally stock of the National Bank of Germantown, of which institution testator had been president, of the Atlantic Elevator Company, and Philadelphia Motor Accessories Company, of which companies testator had been director, and of a finance company. The bank stock was retained at the widow's request and the stock of the elevator company and of the accessories company was sold at her suggestion, after the execu-

tors had obtained for her and her counsel complete information about their condition—they being closely-held corporations. The executors also coöperated with the widow in selling to her certain additional household and personal articles at the inventory prices. Mr. Donald Williams (not a party in interest), the trust officer of the National Bank of Germantown, co-executor, testified that while the widow was at his desk he "asked her to consider the items in the inventory and let me know what it is, if any, she desired to have retained in her share. And she told me she wanted the 800 shares of the bank stock". The widow testified there were no other stocks discussed than those specifically mentioned above. Mr. Williams further testified that he consulted with counsel for the estate who agreed with him and the individual executor that "the time was approaching for the preparation and filing of the account and that I felt we should convert those things which had not been specifically requested to be retained". Also in speaking of obtaining the advice of Mr. Wilkinson, of counsel for the executors, he said: "I told him that we discussed the fact that the time was approaching for the preparation and filing of the account and that I felt we should convert those things which had not been specifically requested to be retained". Then, "we subsequently watched the market and when we thought the time had come we must sell to be prepared for the account . . . and to get the best market that had been available for some time and we began to sell and sold them all within a short time". He said that this subject was discussed in connection with the condition of the market several times beginning fairly early in the summer. On cross-examination, he admitted that he knew at this time who was counsel for the widow and that he gave counsel no notice of the sales. Then he said "we had the understanding and thought that those things which we had not been advised somebody wanted retained, it was our

duty to sell and sell within the six months". The sales in question were made between September 10, 1940, and October 2, 1940. The account was filed October 29, 1940, and reflects principal debits of $235,102.90 consisting almost completely of stocks. Taxes were $58,900 and cash legacies amounted to $41,000, while expenses of administration were slightly in excess of $15,000, all constituting cash requirements of approximately $115,000. Securities retained at the time of the audit were valued at $72,846. The audit was held on February 7, 1941, at which the widow's allowance of $5,000 was granted and the widow claimed loss involved in the surcharge as stipulated, $3,159.71, constituting one half of the value of the assets so sold as of the date of the audit.

From this review of the evidence, we conclude that the accountants fulfilled their duty to the widow. The equities are patently in their favor. They faithfully performed a difficult task. It would be unjust to these executors now to hold that as of the date of the conversion, the cash requirements and possible debts, the nature and extent of the assets (not personal or sentimental in character) sold, did not require complete conversion of assets beyond those selected for retention. In fact, we seriously doubt whether the executors would now be surchargeable had they sold the converted stocks even in the face of an express demand by the widow for their retention. Any other review of their actions would involve the substitution of hindsight for their exercise of judgment and, therefore, we cannot hold that they abused their discretion: Shipley's Estate (No. 1), 337 Pa. 571. The record discloses no careless, capricious, or arbitrary disregard of Mrs. Williams' rights: Stephen's Estate, 320 Pa. 97. We, therefore, find that they exercised common skill, common care, and common caution, and that the findings of the auditing judge are not sustained by the evidence: Casani's Estate, 342 Pa. 468.

The re-reference to the auditing judge was for the purpose of ascertaining the full story of Mrs. Williams' request for the retention of the stock of the Germantown National Bank; whether from the circumstances the executors were reasonably led to believe Mrs. Williams wanted no other assets in kind and, acting thereupon, sold the stocks in question. The auditing judge found from the testimony that the executors did not regard the widow's action "as an implied direction to convert all the other assets". This finding is made without assigning any reason for it and completely disregards the testimony of the trust officer of the corporate executor, Mr. Williams. That testimony, quoted hereinbefore, is clear and convincing to the effect that he asked Mrs. Williams what she desired retained from the inventory, refrained from selling the bank stock and sold that of the Atlantic Elevator Company and of the Philadelphia Motor Accessories Company only after consultation with her and her attorney, coöperated with her in the disposition of the household and other personal effects, that after watching the market, consulting with the individual executor and counsel for the estate, who advised the sale, "we had the understanding and thought that those things which we had not been advised somebody wanted retained it was our duty to sell and sell them within the six months", they sold the stocks involved; these stocks had no peculiar or sentimental value, but were listed on the stock exchange. To contradict this there is only the general statement of the widow that there were no other stocks discussed. Add to this testimony the cash requirements of the estate and the possibility of creditors' claims and the conclusion is inescapable that the conversion was predicated upon the widow's action. We, therefore, come to the conclusion that the executors treated Mrs. Williams' conduct as a waiver and in reliance thereupon converted the disputed stocks: Casani's Estate, supra.

The exceptions consistent with this opinion are sustained, those inconsistent are dismissed, and the adjudication thus modified is confirmed.

President Judge Van Dusen sat at the original argument on the first point of this opinion and approved the decision thereon. He did not sit at the reargument involving the second point, and therefore took no part in the deliberation or decision thereon.

Stearne, J., dissents.