345 A.2d 679
**ESTATE of John B. STETSON, Deceased,**
(two cases).

**Appeal of Thomazine Widdowson CLUM, and William Work Widdowson, Jr., in No. 627.**

**Appeal of John B. STETSON, IV, et al.**

Supreme Court of Pennsylvania.

Argued Jan. 20, 1975.

Decided Oct. 3, 1975.

Cuthbert H. Latta, Morris R. Brooke, Christopher H. Gadsen, Philadelphia, for appellants Thomazine Widdow-

son Clum and William Work Widdowson, Jr.; Drinker, Biddle & Reath, Philadelphia, of counsel.

Samuel T. Swansen, Richard G. Schneider, Philadelphia, for John B. Stetson, IV, Georgia W. Diefendorf, Phoebe Stetson Stewart and Priscilla Stetson Odiorne; Dechert, Price & Rhoads, Philadelphia, of counsel.

John G. Harkins, Patricia L. Freeland, William Carson Bodine, Philadelphia, for appellee, The Fidelity Bank; Pepper, Hamilton & Scheetz, Philadelphia, of counsel.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

John B. Stetson died on February 18, 1906. His will established a trust for the benefit of his wife, his two sons, and their issue. This case requires us to review a decree confirming an interim accounting filed by the Fidelity Bank of Philadelphia, the succeeding and remaining trustee of that trust.

### I

On September 16, 1970, Fidelity filed its third interim accounting in the Orphans' Court Division of the Court of Common Pleas of Montgomery County. Objections to the account were filed by two groups of objectors, all of whom are beneficiaries of the trust and grandchildren of one of the decedent's sons, John B. Stetson, Jr. The objections concerned Fidelity's allegedly imprudent failure to dispose of certain trust assets and its settlement for less than the full amount of a secured obligation held by the trust.

Fidelity's account was audited on November 2, 1970, and July 9, 1971. An evidentiary hearing was held on January 22 and 23, 1973, at which the court heard testimony and received numerous documentary exhibits. On March 7, 1974, the court rendered an adjudication nisi

confirming the account. On July 11, 1974, the court entered a decree dismissing exceptions to the adjudication filed by the objectors and confirming the account. These appeals ensued.[1] We affirm in part, vacate in part, and remand for further proceedings.

A precise statement of the complex factual situation is necessary for a proper understanding of this case.

## II

A substantial portion of the assets of the trust from its creation consisted of the common and preferred stock of the John B. Stetson Co., a manufacturer of hats, of which the decedent was the founder. The decedent's will provided that, while his widow remained alive, the Stetson Co. stock was not to be disposed of by the trustee without her consent.[2]

For many years the Stetson Co. prospered. However, in the 1960's, fashions changed and men no longer wore hats. By the mid-1960's it was evident that the hat industry in general and the Stetson Co. in particular were declining. The Stetson Co. had ceased earning a profit, the market price and book value of its shares were decreasing, and the ability of the company to continue paying dividends was in jeopardy. In 1966, Fidelity determined that the trust's shares of the Stetson Co. should be sold if a satisfactory price could be obtained.

Major difficulties were encountered in attempting to sell the stock. Until April, 1967, Stetson Co. shares were traded on the American Stock Exchange; however, the market was extremely thin, and it would have been impossible for Fidelity to have sold the trust's large block on the Exchange. Thereafter, Stetson Co. stock was traded over the counter, but here the market was even thinner.

All parties agree that the only method of disposing of the Stetson Co. stock was a sale to a group of New York

1. See Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 202(3), 17 P.S. § 211.202(3) (Supp.1975).

2. She died before the period now under consideration.

interests comprised of Ramco Enterprises, Inc., United Hat Fur Cutting Co., and Best & Co., Inc. The Ramco group, controlled by two elderly gentlemen, Ira Guilden and Phillip Roth, had by 1966 acquired a sufficient number of Stetson Co. shares to give it working, although not majority, control.

In January, 1967, Fidelity was approached by Norman Karpf, a vice-president of the Stetson Co. and president of the United Hat Fur Cutting Co. Karpf informed Fidelity that he and several others were interested in buying the trust's holdings of Stetson Co. stock. Karpf did not indicate that he was affiliated with the Ramco group. Fidelity advised Karpf to submit an offer in writing.

On March 14, 1967, Karpf, submitted a "firm offer" to buy on behalf of United Hat "and associates" the trust's Stetson Co. common stock at $20.00 per share and preferred stock at $26.00 per share. On March 27, Fidelity responded that it "had concluded that we would be willing to accept the offer of $20.00 per share for the common stock but we could not accept the offer for the preferred stock." Fidelity indicated that it would be "glad to discuss this further with you."

Two days later Karpf's (and the Ramco group's) counsel telephoned Fidelity and informed it that the buyer of the trust's common stock would be Best & Co. He also transmitted to Fidelity the draft of a proposed letter-agreement of sale. On March 30, Ramco's counsel transmitted copies of the agreement of sale executed on behalf of Best & Co.[3] The letter agreement, received by Fideli-

---

3. "March 30, 1967
 "Fidelity-Philadelphia Trust Company,
 As Successor Trustee under Will
 of John B. Stetson,
 135 South Broad Street,
 Philadelphia, Pennsylvania 19109
 "Gentlemen:
 "This will confirm our agreement made this date as follows:
 "1. Upon the terms and conditions of this Agreement, Best & Co. Inc., a New York corporation ('Best'), agrees to purchase from you, and you agree to sell to Best, 14,813 shares of the common stock, $1 par value, of John B. Stetson Company, a Delaware corporation ('Stetson'), at a price of $20 per share, being an aggre-

ty on March 31 or April 3, was executed on behalf of Fidelity, but not returned to Ramco's counsel.

gate purchase price of $296,260. The shares to be sold by you to Best are hereinafter called the 'Shares.'

"2. The sale shall take place on April 7, 1967 at 3 p. m. at your offices (such date and time hereinafter being called the 'Closing Date').

"3. On the Closing Date, you will deliver to Best the following:

(a) A certificate, signed by you as Successor Trustee under the Will of John B. Stetson, warranting and representing that all of the Shares are being sold to Best free and clear of any and all mortgages, pledges, liens, encumbrances, restrictions, agreements, equities and claims of every kind and nature whatsoever;

(b) An opinion of your counsel, in form and substance satisfactory to counsel to Best, that you have full power and authority under all governing instruments and applicable law to sell the Shares to Best in accordance with the terms of this Agreement; and

(c) A certificate or certificates representing an aggregate of 14,813 shares of the common stock of Stetson duly endorsed for transfer with appropriate signature guarantees and/or such other evidence and documentation as may be required to constitute good delivery thereof, as understood by member firms of the American Stock Exchange, such as will pass title thereto on delivery in accordance with the terms of this Agreement.

"4. On the Closing Date, Best will deliver to you:

(a) A certified or bank cashier's check in the amount of $296,260; and

(b) A resolution of the Executive Committee of Best, certified by the Secretary of Best, authorizing the execution and delivery of this Agreement and the purchasing by Best of the Shares in accordance with the terms of this Agreement.

"5. Each of you and Best represents and agrees that it has not negotiated with or through any broker, finder or any other person in connection with the transactions contemplated by this Agreement, other than Mr. Norman Karpf, and each of you and Best agrees to indemnify and hold harmless the other in respect of the claim of any person for a fee or other compensation based upon his retention or alleged retention by the indemnifying party.

"6. All warranties and representations made in this Agreement shall survive the closing and the delivery of all documents hereunder.

"If the foregoing confirms our understanding, please so indicate by signing and returning to us a copy of this letter.

Yours very truly,
Best & Co. Inc.
By
Philip A. Roth, President

"Agreed to and Accepted:
FIDELITY PHILADELPHIA TRUST COMPANY,
 As Successor Trustee under Will of John B. Stetson
 By
 Authorized Officer"

In the meantime, between March 30 and April 5, Fidelity learned both directly and indirectly of opposition to the transaction of G. Henry Stetson, a son of the decedent residing in California and an income beneficiary of the trust. G. Henry both personally and through counsel, communicated adamant opposition to the sale on the grounds of inadequate price and conflict of interest. The conflict of interest claim arose from the facts that the Ramco group already controlled the Stetson Co. and that the president of the Stetson Co. was a director and former officer of Fidelity. G. Henry threatened to institute litigation against all parties to the sale for rescission and damages and to request investigations by the federal securities and banking authorities.

After numerous meetings and consultation with counsel, Fidelity determined that, notwithstanding G. Henry's opposition and threats, it would proceed with the sale, but that it should inform the Ramco group of the situation. Fidelity informed Ramco's counsel of G. Henry's threats on April 5; on the same day Ramco's counsel replied that Guilden and Roth were unwilling to become involved in any litigation and that Ramco (i. e. Best & Co.) would not consummate the transaction as long as any possibility of litigation existed. Fidelity was requested to return the letter-agreement unexecuted. Fidelity unsuccessfully attempted to persuade Ramco to complete the sale.

Fidelity immediately consulted its counsel and asked whether it should institute litigation against the Ramco group. Counsel informed Fidelity orally and later in writing that litigation would be inadvisable. Specifically, counsel opined that 1) Fidelity would face the colorably meritorious defenses that a) no enforcible contract had ever arisen and, upon learning of G. Henry's threats, the buyer had withdrawn an unaccepted offer, or b) even if a contract had resulted, the buyer was relieved of its obligation to consummate the sale because Fidelity was unable, in light of G. Henry's objections, to perform the condition of delivering a certificate representing and

warranting that the shares were being sold "free and clear of any and all . . . claims of every kind and nature whatsoever" (see note 3 supra); 2) Fidelity would have great difficulty proving any damages; and 3) litigation would be costly, especially since it might have to be brought in New York. So advised, Fidelity determined not to institute litigation. It excised the signature of its officer who had signed the letter-agreement and returned it to Ramco's counsel.

Throughout 1967 and 1968, the Ramco interests continued to purchase Stetson Co. shares from other sources and remained willing to buy the trust's holdings if litigation could be avoided. During this period Fidelity expended great effort in seeking to effectuate a sale. In May and June, 1967, Fidelity offered to sell the stock to Ramco at $25.00 per share, because G. Henry indicated that he did not oppose a sale at that price. However, Ramco had been buying from other sellers at less than $25.00, and therefore refused.

Fidelity thereafter resumed its efforts to complete a sale at $20.00 per share on two fronts. First, on numerous occasions it unsuccessfully sought to persuade G. Henry to drop his opposition. It urged him to agree to sue Fidelity only and not the buyers, but he refused. Second, Fidelity frequently attempted to interest the Ramco interests in purchasing the shares, but Ramco refused as long as any threat of litigation remained. In short, despite great effort on the part of Fidelity, both G. Henry and the Ramco group remained unmoved.

In November, 1968, the Ramco group succeeded, through its purchases from other sources, in acquiring a majority of the shares of the Stetson Co. Thereafter Ramco lost interest in acquiring the trust's holdings. Since that time, no market has existed for disposition of the shares held by the trust. It continues to hold 14,813 shares of Stetson Co. common stock.

## III

During the period in which the relevant events of this case occurred, fiduciaries were authorized to

make, hold, and retain only those investments specifically permitted by law, unless the governing instrument provided otherwise.[4] Among the specifically permitted in-

4. Fiduciaries Investment Act of 1949, Act of May 26, 1949, P.L. 1828, § 2:

"Subject only to the provisions of the trust instrument, if any, a fiduciary may accept, hold, invest in, and retain, any of the investments authorized by this act, and shall not be liable for loss on such investments so long as he exercises due care and prudence in the performance of his duties in regard to them."

This section was formerly codified as 20 P.S. § 821.2 (1950); repealed by Act of June 30, 1972, P.L. 508, No. 164, § 3; and replaced by the Decedents, Estates and Fiduciaries Code, 20 Pa.C.S. § 7302(a) (Special Pamphlet, 1975).

Except as otherwise provided by the trust instrument, the investments of a trustee of a testamentary trust, as here, were governed by the law generally applicable to fiduciaries, the Fiduciaries Investment Act of 1949. Fiduciaries Act of 1949, Act of April 18, 1949, P.L. 512, art. IX, § 940 (formerly codified as 20 P. S. § 320.940 (1950)) (repealed by Act of June 30, 1972, P.L. 508, No. 164, § 3) (replaced by the Decedents, Estates and Fiduciaries Code, 20 Pa.C.S. § 7134 (Special Pamphlet, 1975)).

Near the end of the relevant period in this case, Pennsylvania in effect fully abandoned the "legal list" concept and embraced the "prudent man" standard:

"Any investment shall be an authorized investment if purchased or retained in the exercise of that degree of judgment and care, under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income to be derived therefrom as well as the probable safety of their capital.

"The authorization to make and retain investments pursuant to [this provision] shall be in addition to, and independent of, authorizations to make investments pursuant to other provisions of this act and requirements applicable under other provisions of this act shall not affect investments also authorized by [this provision]."

Act of June 25, 1968, P.L. 252, § 1, amending the Fiduciaries Investment Act of 1949, supra § 2 (repealed by Act of June 30, 1972, P.L. 508, No. 164, § 3) (replaced by Decedents, Estates and Fiduciaries Code, 20 Pa.C.S. § 7302(b) (Special Pamphlet, 1975)). The standard here articulated derives from the landmark case of *Harvard College v. Amory*, 9 Pick. 446 (Mass.1830). For an account of the evolution in Pennsylvania from the "legal list" to the "prudent man," see generally Stewart, Legal Investments and the Prudent Man in Pennsylvania: A Study of Evolving Concepts, 37 Temple L.Q. 121 (1964).

Every fiduciary is obligated, in managing the investment of trust assets, to exercise the care, skill, and judgment of an ordinarily prudent person unless it either has or procures its appointment by representing that it has greater skill, in which case it is

vestments were the preferred and common stock of corporations, but only

> "if purchased or retained in the exercise of that degree of judgment and care, under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income to be derived therefrom as well as the probable safety of their capital." [5]

■■ Not only the fiduciary's acquisition but also its retention of investments is subject to duties imposed for the benefit of the trust. As relevant here, if an investment which, when acquired, was an authorized investment becomes unauthorized, the fiduciary is obligated to exercise care, prudence, and diligence in order to dispose of that investment within a reasonable time. See Fiduciaries Investment Act of 1949, Act of May 26, 1949, P.L. 1828, § 16; [6] Restatement (Second) of Trusts § 231 (1959); [7] 3 A. W. Scott, Law of Trusts § 231 (3d ed.

obligated to exercise such greater skill. *Killey Trust*, 457 Pa. 474, 326 A.2d 372 (1974); Restatement (Second) of Trusts § 174 (1959). In this case, appellants did not attempt to prove that Fidelity possessed greater skill than that required of every fiduciary. They did, however, offer evidence that Fidelity represented in advertising materials that it possessed superior investment-management skills (although the advertising material offered apparently was distributed long after Fidelity procured its appointment as trustee). The orphans' court excluded the evidence, and that ruling is not now assigned as error.

5. Act of September 28, 1961, P.L. 1720, § 2, amending the Fiduciaries Investment Act of 1949, Act of May 29, 1949, P.L. 1828, § 9(a), as amended (repealed by Act of June 30, 1972, P.L. 508, No. 164, § 3) (replaced by Decedents, Estates and Fiduciaries Code, 20 Pa.C.S. § 7310(a) (Special Pamphlet, 1975)).

6. "A fiduciary may retain without liability for resulting loss any investment which was authorized when received or made although such investment no longer qualifies as an authorized investment, provided he exercises due care and prudence in the disposition or retention of any such nonlegal investment." This section was formerly codified as 20 P.S. § 821.16 (1950); repealed by Act of June 30, 1972, P.L. 508, No. 164, § 3; and replaced by Decedents, Estates and Fiduciaries Code, 20 Pa.C.S. § 7317 (Special Pamphlet, 1975).

7. "Except as otherwise provided by the terms of the trust, if the trustee holds property which when acquired by him was a

1967); cf. *Lewis Estate*, 344 Pa. 586, 26 A.2d 445 (1942); *Casani Estate*, 342 Pa. 468, 21 A.2d 59 (1941); *Seamans Estate*, 333 Pa. 358, 5 A.2d 208 (1939); *Taylor Estate*, 277 Pa. 518, 121 A. 310 (1923). When a fiduciary retains an investment which has become unauthorized, the burden is upon it to justify its conduct. See *Lewis Estate*, supra, 344 Pa. at 590, 26 A.2d at 447; *Casani Estate*, supra, 342 Pa. at 471, 473, 21 A.2d at 61; *Quinn Estate*, 342 Pa. 509, 512, 21 A.2d 78, 80 (1941); *Reinhard Estate*, 322 Pa. 325, 327, 185 A. 298, 299 (1936); *Taylor Estate*, supra, 277 Pa. at 528, 121 A. at 313.

 The application of these general principles to the facts of this case is, to a large degree, undisputed. Fidelity's retention of the Stetson Co. stock from its appointment as trustee until the middle of the 1960's is not questioned. All parties agree that, in the mid-60's, because of adverse developments in the hat industry in general and the Stetson Co. in particular, "men of prudence, discretion and intelligence" in the management of their own affairs would not retain an investment in stock of the Stetson Co. It is also undisputed that, when Stetson Co. stock thus became an unauthorized investment, a duty arose on the part of Fidelity to exercise skill, prudence, and diligence in disposing of the stock.

## IV

The narrow issue presented on this appeal is whether Fidelity has carried its burden of justifying its retention of the trust's common stock [8] of the Stetson Co. Appellants contend that, if Fidelity had exercised the skill, care, and diligence required of a fiduciary, it would have sold the common stock in 1967 or 1968; in particular,

proper investment, but which thereafter becomes an investment which would not be a proper investment for the trustee to make, it becomes the duty of the trustee to the beneficiary to dispose of the property within a reasonable time."

8. No question concerning Fidelity's retention of the Stetson Co. preferred stock is raised on this appeal.

they argue that the failure to consummate a sale of the shares to the Ramco group was a breach of Fidelity's duty to exercise skill, prudence, and diligence in disposing of an improper investment. Fidelity argues that it succeeded in proving that, in spite of its exercise of skill, prudence, and diligence, a sale of the Stetson Co. common stock was impossible.

We have never had occasion to address the question whether inability to effectuate a sale, notwithstanding the exercise of skill and diligence, justifies the retention of an investment that becomes improper while being held by a fiduciary. We have, however, considered a similar question in a closely analogous situation. When a trustee receives property in kind from the settlor or testator at the creation of the trust which is an improper investment for a fiduciary, then, unless the trust instrument provides otherwise, the trustee is obligated to exercise skill, prudence, and diligence in disposing of that property within a reasonable time. Restatement (Second) of Trusts § 230. (1950) ; [9] see Fiduciaries Investment Act of 1949, Act of May 26, 1949, P.L. 1828, § 14; [10] *Lewis Estate*, supra; *Quinn Estate*, supra; *Casani Estate*, supra; *Seamans Estate*, supra. We have held that a trustee may not be held liable for a breach of duty for retention of an improper investment received in kind when it shows that, due to the absence of a market for that investment, a sale was impossible. *Quinn Estate*, supra (semble) ; *Casani Estate*, supra, 342 Pa. at 472–

9. "Except as otherwise provided by the terms of the trust, the trustee is under a duty to the beneficiary within a reasonable time after the creation of the trust to dispose of any part of the trust property included in the trust at the time of its creation which would not be a proper investment for the trustee to make."

10. "A fiduciary may retain without liability for resulting loss any asset received in kind, even though it is not an authorized investment, provided he exercises due care and prudence in the disposition or retention of any such nonlegal investment."
This section was formerly codified as 20 P.S. § 821.14 (1950); repealed by Act of June 30, 1972, P.L. 508, No. 164, § 3; and replaced by Decedents, Estates and Fiduciaries Code, 20 Pa.C.S. § 7315(1) (Special Pamphlet, 1975).

73, 21 A.2d at 61 (dictum) ; *Seamans Estate,* supra, 333 Pa. at 364, 367, 5 A.2d at 212, 213; *Reinhard Estate,* 322 Pa. 325, 327, 185 A. 298, 299 (1936) ; cf. 3 A. W. Scott, Law of Trusts § 230.2, at 1872 (3d ed. 1967) ; see also *Miller Estate,* 345 Pa. 91, 26 A.2d 320 (1942) ; *Dempster Estate,* 308 Pa. 153, 162 A. 447 (1932) ; *Dauler Estate,* 247 Pa. 356, 93 A. 511 (1915). "The trustee cannot be surcharged for not selling something that nobody would buy." *Reinhard Estate,* supra.

█ We see no reason why that principle should not be applicable to the closely analogous situation presented in this case. We hold that a fiduciary justifies its retention of an investment which becomes improper when it proves that disposition of the investment was impossible because no market for it existed and the absence of a market is not due to the fiduciary's failure to exercise skill, prudence, and diligence.

## V

All parties agree that the only possible market for the Stetson Co. common stock was the Ramco group. The record is clear that, once the Ramco principals learned of G. Henry's threats and as long as those threats persisted, this market was closed to Fidelity. The central dispute in this case is whether the foreclosure of this market is due to Fidelity's failure to exercise, or occurred in spite of the exercise of, skill, prudence, and diligence.

The parties devote considerable energy to argument of the question whether an enforceable contract arose in March-April, 1967. Appellants contend that mutual manifestations of assent resulted from the discussions and exchanges of correspondence, perhaps as early as March 27, and that the letter-agreement document was merely for the purpose of formally memorializing their contract. The thrust of this argument is that, at that point, Fidelity had a buyer who was contractually obligated to take and pay for the shares, and, in breach of its duty to diligently attempt to dispose of an improper investment, failed to enforce that obligation.

Fidelity responds that there was no mutual manifestation of assent resulting from the negotiations. The only contract that could have arisen, Fidelity contends, was from the letter-agreement. An indispensible step of Fidelity's acceptance, according to it was return to Ramco's counsel of an executed copy, and because Fidelity was requested to return the letter-agreement unexecuted before it had taken that indispensible step, Ramco's offer to buy was withdrawn before acceptance. Fidelity adds that, even if an enforcible contract had arisen, the buyer was relieved of its obligation because Fidelity was unable to perform its obligation to represent and warrant that the shares were being sold "free and clear of any and all . . . claims of every kind and nature whatsoever . . . ." Appellants respond that G. Henry's opposition to the sale was not a "claim" within the meaning of the letter-agreement.

We need not decide the question whether a contract arose which could have been enforced against Best & Co. If, with the benefit of hindsight, we could conclude that an enforcible contract existed and that G. Henry's objections were not a "claim" barring Fidelity's performance, it is manifestly clear from the record that, because of the Ramco principals' aversion to litigation, Best *would* not perform even if obligated. Enforcement would require litigation.

██ The narrow question remaining is whether Fidelity's failure to institute litigation against Best was a failure to exercise skill, prudence, and diligence. We hold that it was not. The situation was not as clear and the question as simple as appellants would now have us believe. Whether a contract existed and Fidelity was able to perform were and are close and difficult questions. "This being the situation, the trustee did the right, the sensible and the prudent thing, it consulted counsel . . . ." [11] Counsel advised that litigation would be costly and success not assured, in light of the

11. *Wanamaker Trust Estate*, 340 Pa. 419, 422, 17 A.2d 380, 381 (1941).

probable defenses that no contract ever arose and Fidelity's inability to deliver a "no claims" warranty. As found by the orphans' court, Fidelity, relying on this advice, decided not to institute litigation. While reliance on the advice of counsel does not provide a fiduciary with "a blanket immunity in all circumstances," *Mintz Estate*, 444 Pa. 189, 200, 282 A.2d 295, 301 (1971), it persuasively rebuts a claim of breach of duty when the decision concerns a matter so dependent on legal expertise as whether to institute litigation. "The trustee was fully justified under the situation here existing in acting upon [counsel's] advice not to bring suit . . . ." *Wanamaker Trust Estate*, 340 Pa. 419, 422, 17 A.2d 380, 381 (1941); see *Mintz Estate*, supra; *Kohler Estate*, 348 Pa. 55, 57–58, 33 A.2d 920, 922 (1943); *Stirling Estate*, 342 Pa. 497, 503–04, 21 A.2d 72, 75 (1941); *Dempster Estate*, 308 Pa. 153, 158, 162 A. 447, 448 (1932); see generally 3 A. W. Scott, Law of Trusts § 201 (3d ed. 1967).

After the breakdown of the March-April, 1967, transaction, the Ramco group remained willing until November, 1968, to buy Stetson Co. common stock, but adamantly refused to buy the shares held by the trust as long as the possibility of litigation instituted by G. Henry remained. The final question is whether Fidelity failed to act skillfully and diligently in attempting to remove this impediment.

The orphans' court found and the record amply demonstrates that Fidelity expended great effort in attempting to persuade G. Henry to withdraw his opposition and Ramco to buy in spite of G. Henry's threat of litigation. Appellants do not suggest any further steps, apart from litigation, that Fidelity could have taken.

Appellants do contend, however, that Fidelity could have "muzzled" G. Henry by seeking judicial approval of the sale under section 963 of the Fiduciaries Act of 1949.[12] We disagree. Whether a section 963 order could

12. "When the trustee is not authorized to do so by this act or is denied the power to do so by the trust instrument or when it is

have successfully been obtained by Fidelity is a question which we need not decide, for, assuming that a section 963 order could have been obtained, it is clear from the record that such an order would not have been effective in removing the impediment to Ramco's purchase.

A section 963 order, assuming it would have been effective in all other respects, would have provided no more than a defense of res judicata in any later litigation. But the Ramco interests demanded more than a successful defense in any litigation G. Henry might institute before they would consummate a transaction with Fidelity. They wanted assurance that there would be no litigation *at all* involving them. As Ramco's counsel testified, "the mere threat of litigation had totally dampened the interest of" Ramco in dealing with Fidelity.

Therefore, because a section 963 order would not have opened the market for Stetson Co. common stock, the absence of a market cannot be the result of Fidelity's failure to seek judicial approval of the sale.

Accordingly, we conclude that the record demonstrates that no market for Stetson Co. common stock existed, and that the absence of a market is not due to Fidelity's failure to exercise skill, prudence, and diligence but rather to G. Henry Stetson's opposition and threats of litigation. Consequently, the orphans' court's refusal to surcharge Fidelity for the depreciation in value of the common stock was correct. "The trustee cannot be surcharged for not selling something that nobody would

> advisable that the sale have the effect of a judicial sale, he may sell, for any purpose of administration or distribution, any real or personal property of the trust, at public or private sale, or may pledge, mortgage, lease, or exchange any such property, or grant an option for the sale, lease, or exchange of any such property, under order of the court, upon such terms and upon such security and after such notice as the court shall direct, whenever the court shall find that such sale, pledge, mortgage, lease, exchange, or option is for the best interests of the trust." Act of April 18, 1949, P.L. 512, art. IX, § 963. This section was formerly codified as 20 P.S. § 320.963 (1950); repealed by Act of June 30, 1972, P.L. 508, No. 164, § 3; and replaced by the Decedents, Estates and Fiduciaries Code, 20 Pa.C.S. § 7133(16) (Special Pamphlet, 1975).

buy." *Reinhard Estate,* 322 Pa. 325, 327, 185 A. 298, 299 (1936).

## VI

Appellants' second objection concerned Fidelity's allegedly imprudent compromise of a secured obligation held by the trust.

In 1928, Fidelity loaned $1,855,399 to the Hahnemann Hospital of Philadelphia and received as security a mortgage on the hospital's real property. Fidelity allocated the investment among various trusts for which it was acting as trustee; the Stetson trust's participation was $41,728. Repayment of the loan was due in 1931.

Hahnemann was apparently unable to repay the loan in 1931 and it remained in default for 30 years. In 1961, Hahnemann received certain endowment funds which were available for satisfaction of the loan. Hahnemann proposed and Fidelity accepted a settlement of the loan for $1,345,164. The trust received $30,252, resulting in a loss of approximately $11,500. Appellants seek to surcharge Fidelity for that loss.

Appellants presented evidence showing that, in 1961, an appraiser employed by Fidelity appraised the Hahnemann real estate at $1,350,000 for the land and $4,200,000 for the buildings. Appellants claimed that Fidelity was imprudent in settling the debt for $1,345,164 when the loan was secured by real estate worth $5,550,000. Fidelity contended that the hospital buildings were so specialized that, in the event of foreclosure, the buildings would have to be demolished and, after subtraction of the demolition costs, the proceeds realized on a foreclosure sale would have been less than the amount received in settlement of the loan.

## VII

While a trustee has a duty "to take reasonable steps to realize on claims which he holds in trust," Re-

statement (Second) of Trusts § 177 (1959), it is clear that it has the power to compromise claims "provided that in doing so he exercises reasonable prudence." Id. § 192. In this case the orphans' court did not determine whether Fidelity had exercised reasonable prudence in settling the Hahnemann claim for 72½% of the face amount. After intimating that Fidelity had acted carelessly and imprudently, the court disallowed the objection on the ground that appellants had failed to carry their burden of proving that more would have been realized on foreclosure than was received in settlement.[13] We conclude that the court committed an error of law in placing the burden of proof on appellants.

▮▮▮▮ It is generally the rule that a trustee who breaches a fiduciary duty will not be surcharged for a loss sustained by the trust if there is no causal connection between the breach of duty and the loss.[14] "If the trustee commits a breach of trust and if a loss is incurred, the trustee may not be chargeable with the

---

13. "Assuming *arguendo* that accountant was derelict in its duties in declining to obtain an outside appraisal, in failing to test the market for other buyers, and in concluding from the confines of their offices. that they could not find any other use for the mortgage properties, the Court is nevertheless required to dismiss the objections concerning satisfaction of the mortgage participation because the Court is not persuaded from the record that accountant would have received more in foreclosure than it received by way of settlement."
Adjudication at R. 28a–29a.
"[T]he Court found no evidence of what the mortgaged properties would have brought in foreclosure, and found as the only evidence of 'value' a written appraisal of accountant's staff appraiser . . . . An accountant cannot be surcharged without *proof* that accountant would have realized more in foreclosure than it did by way of settlement. . . . The salient facts relied upon by the staff appraiser in concluding that 'the improvements are worth' $4,200,000.00 are not in the record. Accordingly, his bare conclusions are insufficient to . meet the standard of proof required of exceptants."
Opinion sur Exceptions at R. 73a.

14. A different rule may pertain where bad faith or self-dealing on the part of the trustee is involved. See generally 3 A. W. Scott, Law of Trusts § 205.1 (3d ed. 1967); Niles, A Contemporary View of Liability for Breach of Trust, 29 Record of N.Y.C.B.A. 573 (1974); Note, Liability of Trustee in the Absence of Causal Relation Between Wrongdoing and Loss, 50 Harv.L.Rev. 317 (1936).

amount of the loss if it would have occurred in the absence of a breach of trust." Restatement (Second) of Trusts § 205, comment f., at 460 (1959); see *Nola Estates,* 333 Pa. 106, 3 A.2d 326 (1939); *Darlington Estate,* 245 Pa. 212, 91 A. 486 (1914); 3 A. W. Scott, Law of Trusts § 205.1 (3d ed. 1967). Therefore Fidelity would not be liable for the loss of $11,500 if that loss would have been sustained had Fidelity acted prudently and carefully.

The determinative question, not previously answered by this Court, is who bears the burden of proving or disproving the existence of a causal connection between the breach of duty and loss. The orphans' court held that appellants were bound to prove that a greater amount would have been realized had Fidelity been careful and prudent. We disagree.

In general, one who seeks to surcharge a trustee bears the burden of proving that the trustee breached an applicable fiduciary duty. *Killey Trust,* 457 Pa. 474, 478, 326 A.2d 372, 375 (1974); *Linn Estate,* 435 Pa. 598, 607, 258 A.2d 645, 650 (1969). However, when a beneficiary has succeeded in proving that the trustee has committed a breach of duty and that a related loss has occurred, we believe that the burden of persuasion ought to shift to the trustee to prove, as a matter of defense, that the loss would have occurred in the absence of a breach of duty. Accord, *Branch v. White,* 99 N.J.Super. 295, 313, 239 A.2d 665, 674, cert. denied, 51 N.J. 464, 242 A.2d 13 (1968); [15] cf. Restatement (Second) of Trusts § 212(4) (1959). We believe that, as between innocent beneficiaries and a defaulting fiduciary, the latter should bear the risk of uncertainty as to the consequences of its breach of duty.

The orphans' court erroneously determined that appellants failed to prove a causal connection between

15. "[T]he burden of proof should be on the defaulting trustee clearly to disestablish causal connection between default and loss to the beneficiary, rather than the contrary."

Fidelity's assumed carelessness and imprudence and the loss sustained by the trust. Therefore, the portion of the decree confirming Fidelity's account of the settlement of the Hahnemann loan must be vacated. On remand, the court must determine whether appellants have proved that Fidelity acted imprudently or carelessly in accepting Hahnemann's settlement proposal. If the court concludes that they have, it must further determine whether Fidelity has proved that the loss to the trust would have occurred in the absence of a breach of duty. If the orphans' court finds the record inadequate to make these determinations, it may, in its discretion, re-open the record and permit the parties to offer additional evidence.

Decree affirmed in part and vacated in part; case remanded for further proceedings consistent with this opinion. Costs to be borne by the trust.