527 A.2d 1034

In re ESTATE OF Rosaline B. FEINSTEIN, Deceased.

Appeal of COMMONWEALTH of Pennsylvania as Parens Patriae for Charities.

Superior Court of Pennsylvania.

Argued Jan. 28, 1987.

Filed June 19, 1987.

Lawrence Barth, Deputy Attorney General, Philadelphia, for appellant.

Before CAVANAUGH, OLSZEWSKI and MONTEMURO, JJ.

MONTEMURO, Judge:

The Attorney General, as parens patriae for charities, challenges an order in which the Court of Common Pleas of Philadelphia County, Orphans' Court Division, confirmed absolutely the first and final account of appellee trustees. Appellees administered a charitable remainder unitrust established under the Will of Rosaline B. Feinstein. The question before us is whether appellees unduly favored the interests of the interim beneficiaries over those of the remainderman charity by retaining tax-exempt municipal bonds as the primary asset of the trust. We conclude that appellees have not breached their duty of impartiality, and we therefore affirm.

Rosaline Feinstein died on November 20, 1972. In her Will, Ms. Feinstein appointed appellees, I. Jerome Stern and Saul J. Freedman, as co-executors of her estate. She directed appellees to hold $200,000 of the estate in trust for her

sister, Charlotte B. Orlick, and her brother-in-law, Ira P. Orlick. Charlotte and Ira were to receive from this trust a yearly income equal to five percent of the annual net fair market value of the trust assets. Upon the death of both, the Federation of Jewish Agencies of Greater Philadelphia would receive the balance of the assets, including any income that had accrued over the trust period in excess of those amounts which appellees had paid out to the Orlicks. Appellees funded the trust initially with tax-exempt municipal bonds directly from the holdings of Ms. Feinstein. These bonds at the time had a market value of $198,627.08.[1] Appellees, according to the testimony of I. Jerome Stern, regarded tax-exempt bonds as a stable investment that would yield a regular, tax-free income for Charlotte and Ira Orlick without compromising the remainder interest of the charity. Although taxable investments would have produced a greater return for the trust, Mr. Stern and his co-trustee believed that the resulting tax burden, which would have rested on the Orlicks alone, outweighed any potential gain. The Orlicks, moreover, had indicated to appellees at the outset that they hoped to receive $10,000 of tax-free income yearly from the trust. Federal tax law would treat the five percent "unitrust" payments as tax-exempt income to the Orlicks only to the extent that the trust itself generated tax-exempt income. *See* I.R.C. §§ 664(b)(1), 643(a)(5); 26 C.F.R. §§ 1.664–1(b), 1.643(a)–5.[2] The municipal bonds in the estate of Ms. Feinstein offered an investment that was both authorized under Pennsylvania law, *see* 20 Pa. C.S.A.

1. Mr. Stern and Mr. Freedman also chose to retain the tax-exempt bonds to fund several additional testamentary trusts, some of which Ms. Feinstein had established for Mr. Freedman's own children. Ms. Feinstein empowered appellees to retain any of the assets of her estate, including the bonds here in question, for as long as appellees deemed retention "advisable." The estate contained enough bonds to fund almost the entire amount allotted to each trust. Appellees used cash to round off the balance of the $200,000 trust for the Orlicks.

2. The unitrust, as such, is not subject to any federal income tax. *See* I.R.C. § 664(c). The charitable remainderman, moreover, is equally exempt from tax liability on amounts received upon termination of the trust. *See* I.R.C. §§ 664(d)(2)(A), 170(c), 501(a), (c). Thus, tax liability, if any, falls exclusively on the life or interim beneficiary in the usual case.

§§ 7303, 7305, and tax-exempt under federal law, *see* I.R.C. § 103(a). With these considerations in mind, appellees retained the bonds in the trust portfolio throughout the trust accounting period.

Unfortunately, inflation and high interest rates drove bond prices down during this period. As a result, the trust suffered a $46,607.40 net principal loss when terminated in 1985, upon the death of Ira Orlick. Mr. Stern testified that although he and his co-trustee were aware of the decline in market value during the late 1970s and 1980s, they anticipated a revival of the sagging bond market and continued to view municipal bonds as more stable than "any other form of investment" available at the time. Mr. Stern further testified that Ira Orlick, whose wife died in 1976, complained on numerous occasions about the decline in his trust income. Because the Orlicks received a fixed percentage of all trust assets, as opposed to income only, the depreciation of trust principal reduced the amounts payable to them.

Upon termination of the trust, appellees filed their first and final account as trustees. The account revealed that a principal balance of $139,953.91 and an undistributed income balance of $33,310.88 remained for distribution to the Federation of Jewish Agencies. The Attorney General interceded and objected.[3] Among other things, he argued that appellees had failed to administer the trust with the appropriate degree of prudence and that appellees had unduly favored the interests of the individual beneficiaries over those of the charitable beneficiary. He therefore sought to surcharge appellees for any resulting losses suffered by the charity. After a hearing, at which only appellee Mr. Stern testified, the trial court filed an adjudication in which it rejected the contentions of the Attorney

---

3. Although the charity itself has not objected to the account, this neither limits the authority of the Attorney General to object nor vitiates the force of the Attorney General's arguments. The Attorney General represents a broader interest than that of the charity alone. He must protect the interests of the public at large "to whom the social and economic benefits of [charitable] trusts accrue." *In re Pruner's Estate,* 390 Pa. 529, 531, 136 A.2d 107, 109 (1957).

General and confirmed the account. The trial court *en banc* confirmed the account absolutely by order of June 27, 1986.

On appeal, the Attorney General continues to maintain that appellees breached their duty of impartiality by retaining tax-exempt obligations as an asset of the trust.[4] He contends that appellees sacrificed the growth of the remainder interest to provide tax-free income to the Orlicks. The Attorney General's reasoning is, by his own admission, simple. The charitable remainder unitrust established by Ms. Feinstein differs from the traditional trust arrangement in which the life or interim beneficiary receives all income produced by trust assets during the life of the trust and the remainderman beneficiary takes any principal that remains upon termination. The unitrust gives the charitable remainderman an interest in income production. In addition to principal, the charity is entitled to any income that has accumulated over the trust period in excess of the fixed percentage payments to the life or interim beneficiary. *See* I.R.C. § 664(d)(2)(C). The parties to this action agree that tax-exempt obligations uniformly produce lower income than taxable ones. Although the Orlicks benefited from the receipt of tax-free income, the charity, which is not subject to federal income tax, *see* I.R.C. § 501(a), did not benefit. The investment strategy of appellees, according to the Attorney General, only hurt the remainderman by reducing the income that would otherwise have accumulated for final distribution. The Attorney General in effect argues that tax-exempt obligations are *per se* improper investments for a charitable remainder unitrust because they invariably favor the interest of the life or interim beneficiary over those of the charitable remainderman. We disagree.

We recognize that the charitable remainder unitrust is entirely a creature of federal tax law. If the settlor

4. The Attorney General has abandoned his claim that appellees failed to administer the trust prudently. He appears also to have abandoned his claim that appellees improperly used trust assets to pay a third party for preparing tax returns on behalf of the trust and for providing custodial services.

or testator wishes to take advantage of the tax benefits offered by the unitrust, he or she must comply with a bevy of technical requirements in the Internal Revenue Code and accompanying Treasury Regulations. *See* I.R.C. § 664(d)(2); 26 C.F.R. § 1.664–1 *et seq.* Neither the Code nor the Regulations, however, preempt the fiduciary law of this Commonwealth. Although federal law governs the taxability of the various interests involved, Pennsylvania law governs the interpretation and administration of the trust itself. *See Miller v. U.S.,* 387 F.2d 866, 867 (3rd Cir.1968). Generally, we will not interfere with the exercise of a discretionary power by a trustee unless "the trustee in exercising or failing to exercise the power acts dishonestly, or with an improper even though not a dishonest motive, or fails to use his judgment, or acts beyond the bounds of a reasonable judgment." Restatement (Second) of Trusts § 187 comment e (1957). *See also Abarbanel v. Weber,* 340 Pa.Super. 473, 481, 490 A.2d 877, 881 (1985). Subject to the specific language of the trust instrument, a trustee under Pennsylvania law must exercise discretion in preserving the balance of interests between successive beneficiaries. *See In re Estate of Hamill,* 487 Pa. 592, 598, 410 A.2d 770, 773 (1980); *In re Estate of Weiss,* 454 Pa. 114, 126, 309 A.2d 793, 799 (1973). Professor Scott characterizes this discretion as "considerable" and as not subject to any "absolute rule." 3 A. Scott, Law of Trusts § 232 (3rd ed. 1967). Our supreme court, moreover, has disapproved of presumptive or *per se* rules governing investments by trustees and executors, in the absence of legislation to the contrary. *See Estate of Knipp,* 489 Pa. 509, 513, 414 A.2d 1007, 1009 (1980); *Saeger's Estate,* 340 Pa. 73, 76–77, 16 A.2d 19, 21–22 (1940). The court in *Estate of Knipp, supra* at 513, 414 A.2d at 1009, cautioned that presumptive rules could "arbitrarily foreclose executors and trustees from opportunities to retain beneficial holdings." Each case therefore must hinge on its particular circumstances.

■ This case does not present the usual confrontation between income beneficiary and principal beneficiary. The

most salient characteristic of the unitrust, for our purposes here, is the *lack* of conflict between income and principal. The Orlicks and the charity shared similar interests. Both would have benefited from high income production, and both would have benefited from a stable principal. The Orlicks received, in accord with the requirements of the Internal Revenue Code, *see* I.R.C. § 664(d)(2)(A), a fixed percentage of the annual net fair market value of both the accumulated income and the principal.[5] Thus, as Mr. Stern testified, the decline in the market value of the trust principal prompted numerous complaints from Mr. Orlick, even though income production remained relatively constant throughout the trust period. Of course, the lower income yield on the tax-exempt bonds contributed to the unexpectedly low annual payments. The lower income also diminished the ultimate payout to the charity. The Orlicks and the charity therefore suffered alike in terms of the amounts they received from the trust.

The Attorney General, however, argues that the Orlicks received their payments tax-free while the charity received no offsetting benefit. This argument assumes that the benefits and burdens of an investment decision must balance perfectly between trust beneficiaries. We cannot agree. Absolute evenhandedness is impracticable and, in most cases, impossible. We can only expect our fiduciaries to act with sound judgment and proper motives under the particular circumstances of each case. Appellees in the present case met this expectation. The Attorney General does not challenge on appeal the prudence of investing in bonds during the period in question. Mr. Stern testified that other forms of investment, particularly in the then-depressed stock market, were too risky. The parties agree, moreover, that appellees could not have opted for a "compromise" solution by investing half of the trust in tax-ex-

---

**5.** The Internal Revenue Code required that the trustees treat all payments to the Orlicks as payments from income, to the extent that the trust had income. *See* I.R.C. § 664(b)(1). Any income remaining at the close of the taxable year, together with any principal, served as the basis for computing the amount of the payment in the succeeding year.

empt bonds at a lower interest rate and half in taxable bonds at a higher rate. Federal tax law treats payments to the life or interim beneficiaries of the unitrust first as taxable income, to the extent that the trust has earned taxable income. *See* I.R.C. § 664(b)(1); 26 C.F.R. § 1.664-1(d). If the distribution exhausts the taxable income of the trust, the balance is treated as capital gain, to the extent that the trust has acquired such gain. *See* I.R.C. § 664(b)(2). Only once the distribution exhausts both taxable income and capital gain does federal tax law treat payments to life or interim beneficiaries as tax-exempt income. *See* I.R.C. § 664(b)(2). A split investment scheme would have yielded taxable income for the Orlicks while useless tax-exempt income accumulated for the already tax-exempt charity. Appellees therefore faced a hard choice. They opted for the tax-exempt obligations because, according to Mr. Stern, they believed that the tax burden for the Orlicks would have outweighed the benefits, to either the Orlicks or the charity, of a higher income. The Orlicks were elderly, Charlotte Orlick was dying of cancer and appellees knew that the couple hoped to receive $10,000 of tax-free income yearly from the trust. Moreover, Mr. Stern testified that neither he nor his co-trustee anticipated any detriment to the charity's remainder interest other than the slower rate of growth in those funds which the charity would ultimately receive. In balancing the benefits and burdens of their investment decision, appellees exercised the discretion that Ms. Feinstein bestowed upon them as trustees. The evidence sufficiently demonstrates that appellees acted with a proper motive and within the bounds of reasonable judgment.[6] The orphans' court cannot second-guess a judgment that properly belongs in other hands, and we will not disturb a refusal to surcharge absent an error

6. Mr. Stern testified that the Orlicks were "the primary objects of the bounty of Rosaline B. Feinstein" and that appellees could favor the interests of the Orlicks to the extent that they did because such favoritism was "inherent" in the terms of the Will. Although these conclusions appear to lack a foundation in either the text of the Will or extrinsic evidence, the testimony of Mr. Stern shows that appellees had adequate other reasons for the investment decisions.

230

of law or an abuse of discretion. *See In re Estate of Hamill, supra; Quinlan Estate,* 441 Pa. 266, 273 A.2d 340 (1971).

The burden of proving a surchargeable breach of duty rests with the party seeking the surcharge. *See Estate of Stetson,* 463 Pa. 64, 345 A.2d 679 (1975); *In re Estate of Killey,* 457 Pa. 474, 326 A.2d 372 (1974). The Attorney General in this case offered nothing more than the direct and cross examinations of Mr. Stern. That testimony supports the decision of the trial court to confirm absolutely the first and final account of appellees. We therefore affirm.

Order affirmed.